### CALVIN WILSON v. STATE.

No. A-3815.   Opinion Filed May 5, 1923.
Rehearing Denied Sept. 15, 1923.
(217 Pac. 885.)

(Syllabus.)

1. **Evidence—Evidence of Accomplices Sufficiently Corroborated.** The testimony of the accomplices is sufficiently corroborated to show that the defendant, if not a participant in, was the instigator of, the crime, and was implicated in its commission.

2. **Riot—Evidence Supporting Conviction.** There was no prejudicial error in the reception of testimony, and the evidence as a whole was sufficient to support the verdict.

3. **Appeal and Error—Excerpts from Remarks of Counsel—Insufficient Record.** Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel.

Appeal from District Court, Atoka County; J. H. Linebaugh, Judge.

Calvin Wilson was convicted of rioting, and he appeals. Affirmed.

J. W. Clark, for plaintiff in error.

Geo. F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

BESSEY, J. In the information filed November 14, 1919, Calvin Wilson, plaintiff in error, was charged jointly with his son and others with the crime of rioting. At the trial, February 13, 1920, the son was discharged, and the plaintiff in error was found guilty as charged, and his punishment fixed at imprisonment in the penitentiary for a term of three years. To reverse this conviction he appeals.

For convenience in this opinion the plaintiff in error will be referred to as the defendant. The state introduced evidence tending to show that on or about the 15th day of February, 1919, Calvin Wilson, Arlie Wilson, Melvin Rogers, and Le Roy Dorr committed the crime of rioting, by going in the nighttime and shooting into a house occupied by one J. D. Glover with shotguns and Winchester rifles. The state's case rested largely upon the testimony of Le Roy Dorr and Melvin Rogers, self-confessed accomplices.

The defendant in his brief contends that the judgment of the trial court should be reversed for three reasons:

First. That there is no sufficient corroboration of the testimony of the accomplices.

Second. Because of the reception of incompetent and prejudicial testimony.

Third. Misconduct of the county attorney in his argument to the jury.

The testimony of Le Roy Dorr, one of the accomplices, is in part as follows:

"Q. Tell the jury what conversation you had with Calvin Wilson and Arlie Wilson at that time. A. We was—we hap-

pened to be up there and struck up with them, and they asked us did we want to make some money easy, and we told them we did, and he said he had a fellow over there he wanted to move; that he had control of the place this fellow was on.

"Q. Who do you mean by he? A. Calvin Wilson. We told him that we would like to make some easy money, and he said he would give $10 if we would help him move them. We told him all right. He said that he had tried every way, and that he thought the only way he could move him was to scare him off the place, and we told him all right, and we talked around there a while, and he said we would go over to his house, and Melvin Rogers and myself could take a gun and go over there and give Glover a talking to, and we told him all right, and we goes over to Calvin's and gets a Winchester, and Arlie goes with us.

"Q. Who did you get that Winchester from? A. Calvin. And we goes down there pretty near to Mr. Glover, and Arlie stops about 200 yards from the house, and we goes right down to the house and hollers, 'Hello,' and Mrs. Glover, she came out—I suppose it was Mrs. Glover; it was a lady—and we asked her where Mr. Glover was at. She said he was down near the end of the field south, making posts. We told her we wanted to see him; so we goes on down there and asked him was that Mr. Glover. He said he was, and we told him we was strangers in that part of the country and we was friends of Mr. Wilson, and that we come down there to see about getting him to move, and he said something about they had a case in court. We told him we didn't care nothing about that; he had to be out of there by Monday morning; if he didn't, we was going to shoot the top of his house off. He said he was not scared of nothing like that; and me and him kind of got into an argument, and his boy stopped the old man.

"Q. Were you armed at that time? A. Yes, sir.

"Q. What did you have? A. I had a Winchester. * * *

"Q. Tell the jury what the frame-up deal was and all about it. A. They said it would be the best—we all decided

it would be best to wait until along about 11 o'clock before we started up, and we set around and smoked and talked about it until about 11 o'clock, and got the guns and goes over there.

"Q. Where did you get your gun? A. There at Calvin's house.

"Q. What kind of gun did you get? A. Single-barreled shotgun.

"Q. Did the other men get guns, too? A. Melvin Rogers, he got a .22 rifle; Calvin, he had a Winchester, a .38 it looked like; Arlie had a single-barrel shotgun, same as I had.

"Q. Do you know whose guns they were? A. I suppose they was Calvin's; he had them there at the house; he got them for us.

"Q. After you got the guns, what did you do? A. We started across the field and goes over to Glover's house.

"Q. When you got to Glover's house, or near there, what did you do then? A. Calvin says: 'I will go up here, in front of this house, behind a log. You all go around to the north of the house, towards the field.· You all need not be a bit uneasy; if he comes out I will get him.' So we goes around to the large trees north of the house, and commenced shooting. Arlie and myself.

"Q. Where was Melvin Rogers at that time? A. He was between Arlie and myself and Calvin.

"Q. Say you began shooting? A. Yes, sir.

"Q. What were you shooting at, if anything? A. At the house.

"Q. At whose house? A. Glover's.

"Q. How many shots did you fire? A. Five shots.

"Q. How many shots did Calvin Wilson fire? A. One.

"Q. How many shots did Melvin fire? A. He didn't fire any; if he did, I couldn't hear it.

"Q. How many shots did Arlie Wilson fire, if any? A. Four shots."

After this, according to Dorr's testimony, they all returned to the home of the defendant, near there, where they spent the rest of the night. The testimony of Melvin Rogers, also an accomplice, was to the same general effect.

There was some corroboration of these witnesses, connecting the defendant with the crime. By the testimony of J. D. Glover, occupant of the house where the riot took place, in his account of the visit of Dorr and Rogers the day before the shooting, it appears that the following occurred:

"Q. Go ahead and tell us what Le Roy Dorr said, if anything. A. He said he was a stranger in the country, and was a friend of Calvin Wilson's, and said he had come down to tell me to leave the place. I says, 'Young man, what have you got to do with it?' He says, 'That is enough.' I said, 'What are you down here for, anyhow?' He says, 'I am deputized to come down here and tell you to vacate the place.' I said, 'Deputized by who?' He says, 'That is all right, by who;' and I said, 'I have got a case pending in court, and whatever the court says I am willing to abide by it;' and he says, 'I will just give you until Monday to leave here;' and I says 'Them threats don't—' and he said, 'By Monday to leave here; if you don't, I will tear the top off your house.' I says, 'Young man, them threats don't bother me any, and I will be there at the tearing of the roof off the house.'

"Q. Were these men armed at the time? A. One of them had a Winchester. * * *

"Q. After the conversation there, where did they go, in what direction? A. They went off a little bit north of east, into the woods.

"Q. Did anything happen around your place that night? A. Yes, sir."

Then followed an account of the fusillade of shots into

the house that night, by persons not recognized by the witness.

It appeared from other evidence that defendant had sued J. D. Glover for possession of this house, and that there was hostile feeling between the two men. That fact, together with the statement of Dorr that he was a friend of the defendant, and the fact that he threatened violence to the home of this witness if he failed to vacate, are circumstances strongly corroborating the testimony of the accomplices, showing motive, and indicating that the defendant was implicated in the riot. There was also evidence given by Mary Glover, the daughter of J. D. Glover, to the effect that defendant shortly before this occurrence came to their home armed and ordered them to stop cutting timber, and told this witness that, "if papa wanted to leave with his family, he had better be leaving." In addition to this, there was some evidence concerning footprints leading from the scene of the riot to near the home of the defendant.

Altogether, we think the testimony of the accomplices was sufficiently corroborated to show that the defendant, if not a participant in, was the instigator of, the crime, and was implicated in its commission.

In Moody v. State, 13 Okla. Cr. 327, 164 Pac. 676, the court said, in the syllabus:

"Evidence corroborating an accomplice and tending to connect the defendant with the commission of the crime need not be direct, but may be circumstantial only."

"It is not essential that the corroborating evidence shall cover every material point testified to by the accomplice, or be sufficient alone to warrant a verdict of guilty. If the accomplice is corroborated as to some material fact or facts by independant evidence tending to connect the defendant with the commission of the crime, the jury may from that infer

that he speaks the truth as to all. Such corroborating evidence, however, must show more than the mere commission of the offense or the circumstances thereof."

For a fuller discussion of the sufficiency of corroborating evidence see the body of the opinion in the Moody Case.

The objection as to the alleged incompetence of certain testimony is not well taken. The objections made relate mostly to the order in which the testimony was offered showing a common design of and concert of action between the persons who did the shooting. Such common design may be shown by different circumstances, and the order and manner of the showing is governed by the exercise of a wise discretion on the part of the trial judge. It is also contended that the evidence concerning the tracks was too indefinite and remote and should have been excluded. If the evidence of tracks in any degree tended to show who the perpetrators of the crime might be, the evidence was admissible. The force and weight of such testimony was for the jury.

Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel. The record here shows that some of the objections to remarks of counsel were sustained, and the jury admonished not to consider them. Without going into a tedious recital of details, a careful examination of this feature of the case indicates that the things complained of were not prejudicial.

The judgment of the trial court is therefore affirmed.

MATSON, P. J., and DOYLE, J., concur.