# CLYDE HAGAN, Jr., v. STATE.

No. A-10119.   March 3, 1943.

(134 P. 2d 1042.)

128

Harry C. Kirkendall, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., J. Walker Field, Asst. Atty. Gen., and Hugh Conway, Co. Atty., of Enid, for defendant in error.

BAREFOOT, J. Defendant, Clyde Hagan, Jr., was charged in the district court of Garfield county with the crime of larceny by fraud, was tried, convicted, sentenced to serve a term of one year in the penitentiary, and has appealed.

To properly consider the assignments of error presented, it is necessary to make a brief statement. There is very little conflict in the evidence of the state and the defendant. On January 14, 1941, a complaint was filed in the justice court, charging the defendant with the larceny of 39 bushels of wheat of the value of $29.64. When the information was filed in the district court on February 1, 1941, he was charged with the larceny of 114½

bushels of wheat, by reason of the evidence at the preliminary hearing. On February 6, 1941, a motion for continuance was filed on the ground that the defendant had not had time to prepare for trial, and on account of the illness of his attorney. The motion was heard on February 10, 1941, and the case continued to February 17, 1941, at which time the trial commenced.

The first assignment of error is that the court erred in refusing to grant a further continuance. The doctor who examined counsel made the following statement: "To Whom It May Concern:

"I desire to state that I am treating Mr. Harry Kirkendall for exaggerated bronchial irritation following influenza and have recommended he use his throat as little as possible until improved."

Upon this statement the case was passed until February 17th. No further evidence was offered on the 17th, except that defendant had not had ample time to prepare for trial. Under the record, we do not find that there was an abuse of discretion by the court in refusing to grant further continuance. The only witness whom it was contended was not present was William Linneger, who was a codefendant, and who had left the state and has never been apprehended.

It was further contended that it was error to permit the endorsement on the information of six additional witnesses on the morning of the trial. The record does not reveal the exact date the names were endorsed. In the brief of the state it is stated that the endorsement was made a week prior to the trial. In the defendant's brief it is stated that he did not see the names until the date of the trial. It appears from the record that two of the witnesses were not called to the stand, and the evidence of the others was upon mostly immaterial matters, and

questions upon which there was little, if any, dispute. It is the general rule that permission to endorse additional names on the information prior to trial is in the sound discretion of the trial court; and, under the facts, we do not find there was error amounting to an abuse of this discretion.

Russell M. Raulston was operating an elevator at Garber, in Garfield county, Okla. On January 4, 1941, he received a telephone call from William Linneger, at Enid, with reference to the purchase of wheat. Mr. Raulsston had previously had dealings with Mr. Linneger, who was an associate of the defendant, and at the time of this telephone call was of the opinion that he had been defrauded in former sales of wheat to these parties. He informed them that they could get the wheat, and at the same time began laying plans for their detection. He had his automatic scale examined and tested. He arranged for one of his employees to be secretly located near where the scale was operated. When the parties arrived at Garber with two trucks of 400-bushel capacity each, he had them drive to the place where the wheat was loaded from the chute. The automatic scale was located in the cupola of the elevator and the wheat was elevated to the scale by means of cups attached to a revolving leather belt. At the top the wheat went into the scale hopper and then into the automatic scale, which was set to dump four bushels at a time. The weight box on the side of the scale contained weight to the amount of 240 pounds, which is the weight of four bushels of wheat. When this amount of wheat filled into the scale, it would automatically dump. If additional weight or pressure was applied to the weight box, an additional amount of wheat equivalent to the amount of weight or pressure applied would go into the scale before it would trip. As much

as five and a half bushels could thus be made to dump each time, instead of the regular four bushels.

Photographs of the scale were introduced, and they revealed, as testified, that by pressing the foot upon a certain part of the machinery, this additional weight might be applied direct. It was the evidence of the state that when Mr. Brown, who was running the motor at the elevator, started the same, the defendant, Clyde Hagan, Jr., went to the cupola where the automatic scale was located, and where the witness Mr. Revell was stationed, and that by placing his foot on the weight box at different times, he was enabled to secure a greater amount of wheat than the automatic scale registered. Mr. Revell noted that the box would become overloaded when this pressure was applied by defendant.

Immediately on defendant leaving the cupola, Mr. Revell reported to Mr. Raulston what had transpired, and what he had seen. The defendant and his codefendant each moved their trucks with the loads of wheat into the public street near the office of the elevator, and immediately went into the office for the purpose of paying for their wheat. Defendant was informed by Mr. Raulston that he owed the sum of $224.96 for 296 bushels of wheat at 76 cents per bushel, as shown by the scale weights. Defendant then paid him that amount in currency and Mr. Raulston issued him a receipt therefor. Mr. Linneger, his codefendant, did the same.

Prior to this time Mr. Raulston had telephoned to the sheriff's office at Enid, and a deputy sheriff, Mr. Leon Coyle, came to the office, and when defendant started to move the load of wheat, he was forbidden to do so by the deputy sheriff. Mr. Raulston then told the defendant that he was not satisfied with the amount of wheat on

the trucks, and that he would have to take them to Enid and have them weighed. The defendant protested by saying this would be 60 miles out of his way, and that if Mr. Raulston was not satisfied with the weight of the wheat, he would dump it back into the elevator and he could pay him his money back. Mr. Coyle, the deputy sheriff, refused to permit this to be done, and he required the defendant to take his trucks to Enid, and upon their being weighed it was found that defendant's truck contained 39 bushels of wheat more than he had paid for, and that the truck of Mr. Linneger, his codefendant, contained 75 bushels more wheat than he had paid for. Defendant offered to pay for the excess amount of wheat, but this was refused, and charges were preferred, charging the defendant with larceny by fraud of the extra amount of wheat. Afterwards attachment proceedings were brought by Mr. Raulston's company and others, in which all of the wheat and the trucks were attached for loss theretofore sustained in the manner hereinbefore mentioned. It is unnecessary to further refer to this civil action.

There was evidence in the record that there was an attempt on the part of Mr. Linneger to turn his truck over on the way to Enid, and the state contended this was under the direction of Mr. Hagan. There was also evidence that upon a previous occasion defendant had purchased wheat from the same elevator under similar circumstances as above stated; it being contended by the state that a conspiracy existed between defendant and others to commit larceny by fraud in the manner above outlined. There was also evidence offered of misstatements of defendant as to the correct weight of his truck, prior to going to Garber for the purpose of securing the wheat.

It may be stated that defendant took the witness stand and denied tampering with the scale at any time, and further testified that he offered to pay for all the wheat, after it was reweighed at Enid.

The contention of defendant is best stated in his brief:

"The defendant contends in this case that there is no larceny by fraud if all the facts and circumstances testified to by the state were true, by reason of the fact that under the well-established principles of law in other jurisdictions and of the well-established principles of law in the State of Oklahoma. The writer of this brief believes the well-established principle of law to be that if the owner consents to the taking of his goods, it is not larceny, although the consent is given solely for the purpose of apprehending the taker in the commission of the act and that the object of the law is to prevent larceny by punishing it and not procuring the commission of larceny that the offender may be punished.

"The defendant further believes and contends that if the consent to the taking was obtained by use of trick or device or fraud, it is still not larceny if the owner transfers the title to the thing taken for if he transfers title, there is not trespass and hence, no larceny and there can be no larceny when title is obtained by fraud or trick unless the owner is ignorant of the facts, while in this case, the undisputed testimony shows that Raulston, the owner, knew everything that is alleged to have happened concerning manipulating of the scales when he took the money and issued receipt therefor and passed title to Hagan."

As to certain principles of law, as contended by the defendant, the state does not disagree. This principle is announced in 36 C. J. p. 777, § 139, and is as follows:

"If the owner of money or a chattel delivers it to another with the intention not only of parting with the possession, but also of investing the person to whom it

is delivered with the title to it, such person is not guilty of larceny in receiving it, although the delivery was induced by the most flagrant fraud or by the commission of a forgery, for the reason that the title having passed, there is no one other than himself in whom an indictment for larceny can lay the ownership and possession of the thing taken."

But it is contended by the state that there was no passing of the title by Raulston to the defendant of the excess bushels of wheat, and that there was no intention on his part to pass the title to any property except the exact amount of wheat that was paid for by the defendant, and that receiving of the excess amount of wheat amounted to larceny by fraud.

It will be noted that there is a close distinction between the contentions of the defendant and the state. The authorities, many of which we have read, note this distinction in cases of this character, and have discussed them very fully. We shall refer to some of these authorities.

A general discussion of the question here involved appears in 32 Am. Jur. p. 913, §§ 27-29, and which is cited by both the defendant and the state, and is as follows:

"Since want of consent by the individual affected, to the taking, is an essential element of larceny, his instigation of or consent to the felonious taking of his property negatives such element and constitutes a defense to a prosecution for the crime. The question most frequently arises in cases where an attempt has been made to entrap the thief. One who seeks to entrap another in the commission of larceny must take care that in his efforts he does not overreach himself and consent to the taking of his property. Therefore, the setting of such trap must not go further than to afford the would-be thief the amplest opportunity to carry out his purpose, formed with-

out such inducement on the part of the owner of the property as to put him in the position of having consented to the taking. The principal line of distinction in the cases seems to be whether there has been an active, as distinguished from a passive, inducement, to the taking, on the part of the owner or his agent. If the criminal design originates with the accused, and the owner or his agent or servant does not suggest the design or actively urge the commission of the crime, the mere fact that the owner, suspecting the accused, in person or through his servant or agent exposes the property, neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property or avail himself of the facilities furnished will not amount in law to a consent, although the agent or servant, by the instructions of the owner, appears to co-operate in the execution of the crime. On the other hand, the owner may not himself or through his agent solicit a suspected party to come forward and commit the criminal act, and, when the act is committed, be heard to say that he did not consent to it. If he, either in person or by a duly authorized agent, suggests to the accused the criminal design and actively urges, co-operates with, and assists the accused in the taking of the goods, such conduct amounts to a consent to the taking and the criminal quality of the act is wanting. Moreover, at least under some circumstances, the mere fact that the plan for obtaining the property was wholly or partly that of the accused is not controlling. Where the owner of property, by himself or through his agent, actually or constructively, aids in the commission of the offense, as intended by the wrongdoer, by performing or rendering unnecessary, some act in the transaction essential to the offense, the would-be criminal is not guilty of all the elements of the offense.

"If the consent of the owner to the taking of property is obtained by fraud or a fraudulent trick or device, such consent will not necessarily prevent the taking from being larceny. Although the rule is that there must be a taking against the will of the owner or a trespass to

the possession, an actual trespass is not always necessary. The requirement may, in a proper case, be deemed sufficiently met where the owner is induced by some fraud or trickery to deliver the property in question to one who feloniously converts it to his own use. The form of the fraud or trick by which possession is obtained is immaterial. In all cases, it results in the absence of a real consent, and some courts declare that the possession of the taker in such a case is not lawful, but wrongful, that there is a continuous wrongful taking from the time possession is thus obtained, and that when the felonious intent to deprive the owner of his property permanently without color of right or excuse and to convert it to the use of the taker without the owner's consent is added to such wrongful taking, larceny becomes complete. While the animus furandi is necessary to make the offense larceny, its absence and the fact that the transaction was intended as a joke would not set up a true consent on the part of the person hoaxed, or establish a bailment, and the joker's possession would still be had for want of any consent. In cases, at least, where a transfer of title as well as possession to the trickster is not involved, the prevailing rule is that any scheme, whether involving false pretenses or other fraudulent trick or device, whereby an owner, of property is swindled out of it with the preconceived intent of the swindler not to pay for it, is classed as larceny and is punished accordingly. In the majority of jurisdictions the view is taken that the fact that the victim is himself guilty of an illegal or fraudulent intent, pursuant to which he parts with his money or property, does not alter the rule.

"Whatever may be the correct view as to whether a subsequent felonious conversion of property obtained by fraud or trick, but without intent to convert it, is larceny, it seems clear that a larceny by fraud cannot be predicated upon a fraudulent conversion of property received from the owner with his consent, in good faith with the intention of handling it lawfully in his behalf and in accordance with his wishes, and without any fraudulent purpose and intent existing at the time of so receiving it.

"It is a well-settled general rule that the requirement of a felonious taking against the will of the owner is sufficiently met, and that larceny is committed, where a person intending to steal another's personal property obtains possession of it, although by or with the consent of the owner, by means of fraud or through fraudulent trick or device, and feloniously converts it pursuant to such intent. The rule is applied not only in cases where the possession of the property is obtained directly from the owner, but also in cases where it is obtained from his agent or a bailee or custodian thereof. The fraud or trick practiced on the person from whom possession is thus obtained enables the requirement of a trespass to the possession of the owner to be met either on the theory that it so vitiates the transaction that the owner retains constructive possession and the conversion is therefore a trespass or on the theory that the fraud or trick itself takes the place of a trespass or is equivalent thereto. It is sometimes said that the requirement of a taking in larceny is met by a constructive taking in these cases. Although, as indicated by the usual statement of the rule, the cases generally involve an actual felonious conversion of the property, and there is authority to the effect that such a conversion is essential to the completion of the offense, the rule would seem to depend upon the view taken as to whether the requirement of trespass is sufficiently met by the fraudulent taking or must await the actual conversion. There is authority to the effect that the crime is complete as soon as the property is received, or as soon as the felonious intent is added to the fraudulent taking. While it is not necessarily larceny merely to take an unauthorized use of property obtained for another pretended purpose, the perpetrator of the fraud need not go so far as to sell the property in order to make the offense complete, even though such was his intention when he obtained possession thereof.

"Under the foregoing general rule, larceny may be committed in a variety of particular ways involving the obtaining of possession through trick, fraud, or false pretext, among which may be mentioned the obtaining, with

felonious intent, of possession of the property of another from the bailee of the owner by a secret change or substitution of checks, tokens, or other marks of identification and the inducing of another to part with possession of his money through a pretended finding and division of 'lost' property, or in exchange for the 'finder's' interest therein.

"In accord with the general rule stated previously in this section, the felonious conversion of personal property by one obtaining possession thereof with felonious intent, in the guise of a purchaser, under circumstances negativing any intention on the part of the seller to part with the title until full payment is made, is larceny in cases where possession is obtained by means of false representations or the giving of a false token, such as a worthless check, as down payment; in cases where one intending to convert the property obtains possession in the guise of a purchaser under a conditional sale agreement and appropriates it to such a use as to prevent its reclamation by the seller; in cases where the owner parts with possession upon the understanding that immediate cash payment is to be made and the pretended purchaser appropriates or removes the property without paying for it; and in cases where, by fraud, or collusion with the seller's employee, the purchaser obtains and carries away a greater quantity of the purchased article than he pays or agrees to pay for."

Many of the statements contained in the above quotation are applicable to the facts here. There is not the slightest evidence that any criminal design originated with Raulston. He did not at any time "suggest or actively urge" the commission of the crime. He suspected the accused, and to some extent laid the trap by asking one of his employees to watch the scale, and by testing the scale, but as stated, this will not amount "in law to a consent" to the taking of the property. There can be no question from the evidence that it was the intention of defendant to fraudulently secure the excess wheat and

appropriate the same to his own use. This is one of the distinguishing elements as recognized by the authorities and by the text above quoted as to when larceny is committed rather than the obtaining of property by embezzlement or false pretense; and under the facts, this case comes clearly within the terms of the statute of larceny by fraud.

In the recent case of Riley v. State, 64 Okla. Cr. 183, 78 P. 2d 712, we have had occasion to discuss the larceny statute, and to distinguish to some extent the difference between the crimes of "embezzlement," "larceny," and "false pretense." We have there reviewed the earlier decisions of this court, and cited authorities from many states. The distinction between these crimes is sometimes very close, but there are underlying differences which are clearly pointed out by the authorities. It is unnecessary for us to again review them.

In the instant case it is contended that defendant under the facts is not guilty of larceny, but if guilty of any crime it is of obtaining money by false pretense. After a careful examination of the evidence and the authorities from this and other states, we cannot agree with this contention.

One of the best reasoned cases distinguishing the difference in these three crimes is the case of People v. Miller, 169 N. Y. 339, 62 N. E. 418, 422, 88 Am. St. Rep. 546, where it is said:

"The distinction between larceny, false pretenses, and embezzlement was concisely stated in the brief opinion of the court in Com. v. Barry, supra [124 Mass. 325]: 'If a person honestly receives the possession of the goods, chattels, or money of another upon any trust, express or implied, and, after receiving them fraudulently converts them to his own use, he may be guilty of the crime of

embezzlement, but cannot be of that of larceny, except as embezzlement is by statute made larceny. If the possession of such property is obtained by fraud, and the owner of it intends to part with his title as well as his possession, the offense is that of obtaining property by false pretenses, provided the means by which they are acquired are such as in law are false pretenses. If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession, merely, and not with his title to the property, the offense is larceny.' In this case the complainant's money was not obtained by the defendant by such means or representations as in the criminal law constitute false pretenses. But the jury could have found that he did obtain the money by means of a fraudulent device, with the intent on his part at the time he received it to convert it to his own use, and also that the complainant intended to part with her possession, merely, and not with the title; and so the verdict convicting the defendant of larceny was warranted by the evidence."

The argument that defendant had not come into possession of the property, but that the title of the same had passed to him, is untenable. The authorities generally, and in this state, are to the effect that it is unnecessary to even move the property from the premises of the owner if the same has been severed therefrom with the intention on the part of the accused to appropriate it to his own use. Blakley v. State, 49 Okla. Cr. 10, 292 P. 878; Brinkley v. State, 60 Okla. Cr. 106, 61 P. 2d 1023; 36 C. J. pp. 749 and 750, §§ 48, 49 and 50.

Here the wheat had been placed in defendant's trucks; the trucks had been moved by defendant from the premises of the owner to the public street. He was ready to remove the same, with the absolute possession when he had paid the owner, and which he had done. He knew

at this very time that he had secured more wheat than he had paid for, and that this was brought about by his manipulation of the scale as above indicated. Taking this fact into consideration, and the further fact that wheat had been taken by the defendant at other times, as shown by the record, it is very clear that larceny by fraud had been committed, as contemplated by the terms of the statute.

"Larceny" is defined by Oklahoma Statutes 1931, § 2253, O. S. A. 1941, Tit. 21, § 1701, as follows:

" 'Larceny' is the taking of personal property accomplished by fraud or stealth, and with intent to deprive another thereof."

It is contended by the defendant that the evidence in this case clearly shows an entrapment, and to support this cites 32 Am. Jur. § 27, heretofore quoted in full, and the case of State v. Hull, 33 Ore. 56, 54 P. 159, 161, 72 Am. St. Rep. 694. A careful reading of the text and the case cited does not bear out the contention that the facts as here shown constituted an entrapment. The correct principle of law is set out in the Hull Case, when the court says:

"And in Williams v. State, 55 Ga. [391], 395, Mr. Justice Bleckley, in his usual clear and lucid style, puts the law thus: 'It seems to be settled law that traps may be set to catch the guilty, and the business of trapping has, with the sanction of courts, been carried pretty far. Opportunity to commit crime may, by design, be rendered the most complete; and, if the accused embrace it, he will still be criminal. Property may be left exposed for the express purpose that a suspected thief may commit himself by stealing it. The owner is not bound to take any measures for security. He may repose upon the law alone, and the law will not inquire into his motive for trusting it. But can the owner directly, through his

agent, solicit the suspected party to come forward and commit the criminal act, and then complain of it as a crime, especially where the agent, to whom he has intrusted the conduct of the transaction, puts his own hand into the corpus delicti, and assists the accused to perform one or more of the acts necessary to constitute the offense? Should not the owner and his agent, after making everything ready and easy, wait passively, and let the would-be criminal perpetrate the offense for himself in each and every essential part of it? It would seem to us that this is the safer law, as well as the sounder morality, and we think it accords with the authorities."

See, also, 1 Bish. Cr. Law, 5th Ed., sec. 262.

The next assignment of error is that the court erred in refusing to give three requested instructions presented by the defendant, and in giving instructions numbered 5 and 6, to which defendant excepted. We have carefully examined the requested instructions, and also the instructions given. It is unnecessary to here quote them in full.

The first requested instruction is a correct, abstract statement of law. The evidence presented did not justify the giving of this instruction. A part of it could not have been given without an explanation thereof. The second requested instruction is contrary to the evidence of both the state and the defendant himself, and should, therefore, not have been given. The same is true of the third requested instruction.

As to the instructions numbered 5 and 6, to which defendant excepted, instruction No. 5 was a general charge which defined the crime of larceny. It contained the four essential elements of the crime, to wit:

"(1) That there must be a taking and carrying away from the possession of another. (2) That the thing taken away must be the property of another. (3) That the taking was against the will of the owner and (4) that

the taking was with a felonious intent." 36 C. J. p. 923, § 530.

Instruction No. 6 was with reference to the statutes on aiding and abetting. There was very little evidence upon which to base this instruction, and it might as well not have been given, but there is nothing in it that prejudiced the rights of the defendant. Insofar as the evidence was concerned there was no issue made by the defendant. The defense which he presented, and which he now presents, aside from the fact that he did not tamper with the scale and there was no intention on his part to commit the crime of larceny, was wholly a question of law. He could have raised this question by a demurrer to the evidence. It was not necessary to have an instruction to present this issue. As to whether he tampered with the scale and the question of intent to commit larceny were presented by instruction No. 5 as above outlined.

36 C. J. p. 930, sec. 545, states the rule as follows:

"When the evidence shows the consent of the owner to have been obtained by trick or fraud, an instruction defining larceny by these means, and distinguishing larceny from obtaining money by false pretenses, should be given; but if there is no evidence that the owner's consent was obtained by trick or fraud, or if the evidence shows that the trick practiced by accused merely gave him access to property which he took without the owner's consent, an instruction distinguishing the two crimes should not be given because likely to confuse the jury."

From what has heretofore been stated, it will be observed that defendant in the instant case was only given access to the property with an opportunity to commit the larceny thereof. At no time was there a consent to the taking, or a suggestion that the same should be taken. It was therefore not error to refuse the requested instructions, and there was no error in the instructions given by the trial court.

Objections are made to the final argument of the county attorney. It is stated in defendant's brief:

"The case made discloses that during the closing argument the county attorney made the statement to the jury as follows: 'The defendant Hagan has been arrested for shoplifting and stealing.' "

An examination of the record does not reveal what, if any, statement was made by the county attorney. It only shows an objection by attorney for defendant, and a reply by the county attorney. Under the rules of this court, it is necessary for the record to show what statements were made by the county attorney before a case will be reversed. Newcomb v. State, 23 Okla. Cr. 172, 213 P. 900; Wilson v. State, 24 Okla. Cr. 332, 217 P. 885.

It is further objected that the county attorney said: "We are breaking up a racket." The record reveals that this statement was made by the county attorney. From an examination of the evidence, we cannot say that the statement was unjustified. Evidence had been submitted as to a conspiracy of several parties to carry out the very facts charged in the information. It does not appear by the verdict that the defendant was prejudiced by any remarks of the county attorney to the jury. 17 C. J. 297, § 3637, 24 C. J. S., Criminal Law, § 1901; Coker v. State, 26 Okla. Cr. 230, 223 P. 711; Tapedo v. State, 34 Okla. Cr. 165, 245 P. 897; Sweet v. State, 68 Okla. Cr. 44, 95 P. 2d 242; Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289; Wagner v. State, 73 Okla. Cr. 317, 121 P. 2d 322.

Finding no error, the judgment of the district court of Garfield county is affirmed.,

JONES, P. J., concurs. DOYLE, J., absent and not participating.