Jane Newman CASTOR, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–15643.

Court of Criminal Appeals of Oklahoma.

July 19, 1972.

Carroll Samara, John C. Monk, Jr., Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Paul Ferguson, Asst. Atty. Gen., & Chief, Crim. Div., Paul Crowe, Legal Intern, for appellee.

BUSSEY, Presiding Judge:

Jane Newman Castor, hereinafter referred to as defendant, was charged, tried, and convicted in the District Court of Oklahoma County, Oklahoma, for the offense of Attempted Larceny by Fraud; her punishment was fixed at two and one-half (2½) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Mrs. Price testified that she was employed at the downtown John A. Brown Store, and had been for approximately four years. During her lunch hour on the fourteenth day of May 1969, she was approached by a colored girl, identified as the co-defendant, Davis, outside the Brown's building, who was carrying an envelope. After a short conversation with the defendant Davis, the defendant appeared and joined in the conversation. The defendant took the envelope, she looked inside it, and then stated that there was money in it. She handed the envelope back to defendant Davis, who stated that she was going to her office to look at the contents. The defendant stated that, "we are entitled to part of the money." Mrs. Price stated that she did not want any part of the money, and that they should give it to the police. Defendant Davis left, and the defendant stated that they should follow her. They followed her and had another conversation. Defendant Davis stated that she was again going to her office to count the money. The defendant asked Mrs. Price for her name and telephone number, and stated that she would call her after work. Mrs. Price reported what had happened to her employer, Edward Tobin, who called the police. Arrangements were made with Mrs. Price by the police to cooperate with the defendants. That evening, the defendant called Mrs. Price and told her that there was $20,000.00 in the envelope, and that they were going to share it with her. She asked Mrs. Price to meet her the next morning at 9:00 at Main

and Harvey Streets. She met the defendant the next morning, and after a conversation on the street, joined the co-defendant, Davis, in an automobile. The defendant stated that each one of them would have to talk to the defendant's lawyer. The defendant left, and was gone a little while, and returned. Defendant Davis then left, and then returned after a short period. The defendant asked her if she was willing to put up $5,000.00 as good faith money, and asked her to go to the bank and draw out the money. Defendant stated that she had $4,500.00 in her purse as good faith money that she was going to put up. The defendant and Mrs. Price proceeded toward the bank, with defendant Davis following them. She and the defendant went to the bank, and drank a cup of coffee; then she proceeded to the teller's window to cash a check, and the defendant started out the door of the bank. She was to draw the money from the bank, and they would go to the defendant's lawyer, return her money, and split the $20,000.00.

Edward Tobin testified that he was the assistant credit manager of the John A. Brown Company, and that upon his return from lunch on May 14, Mrs. Price, an employee, had a conversation with him, after which he called the police department. At approximately 9:00 the following morning, he observed the defendant walk up to Mrs. Price. They walked down the street, and got into an automobile with a colored female. The defendant left the car, and was gone for approximately twenty minutes. He walked down the street, and obtained the tag number of the vehicle. He subsequently followed Mrs. Price and the defendant as they walked toward the bank. They both entered the bank, and drank some coffee, and as Mrs. Price approached the teller's cage, the defendant left the bank.

Officer Greeson testified that on the morning in question he was assigned to the surveillance of Mrs. Price. He observed the defendant meet Mrs. Price on the corner of Main and Harvey Streets. They walked down the street, and got into a vehicle with the co-defendant, Davis. They stayed in the vehicle approximately thirty or forty minutes, and then all three exited. Mrs. Price and the defendant entered the coffee shop of the bank; after leaving the coffee shop, Mrs. Price went into the bank and the defendant walked on down the street east. Officer Greeson immediately placed the defendant and the co-defendant under arrest. They were standing side-by-side when he arrested them. He identified State's Exhibit Number Five, a blue bag containing a packet of phony money found in the purse of the co-defendant, Davis. He testified that he first observed the bag in the hands of the defendant as she left the vehicle in which they had been sitting.

The defendant testified that she lived in Houston, Texas, and was in Oklahoma City on May 15 and 16 with her husband. She testified that she was downtown to cash a check, and was stopped on the street by Mrs. Price and two colored girls. Mrs. Price showed her a package and asked if she knew the prefix on the telephone number on the front of the package. She replied that she did not know, and that she did not live here. The colored girl asked her if she thought it would be all right if she opened it. Mrs. Price said, "Well, don't throw it away. You don't know what's in it," and the two colored girls and Mrs. Price opened the package and said that there was money in it. She testified that she did not see any money. A card was in the envelope, which stated that it was gambling money, and they were sending it this way in order to avoid paying income tax. The colored girl closed the envelope and said that she was going to take it to her boss. Mrs. Price and the colored girl argued about the money, and the colored girl said that she was going to take it to her boss, because she did not want to get into trouble. The two colored girls left, and Mrs. Price suggested that they follow them, or they would never see the money again. They followed her to the store, and encountered her again outside.

Mrs. Price asked her if it was real money, and the girl said, "Yes," and that her boss looked at it and put it in his safe. The colored girl asked her and Mrs. Price for their telephone numbers, and stated that she would contact them that night about the money. The girl called her at approximately 7:00 that evening, and requested that she contact Mrs. Price and meet her the following morning. The following morning, she met Mrs. Price at Main and Harvey Streets, and they walked together, and got in the colored girl's vehicle. The colored girl stated that they were entitled to a portion of the money, and that her boss wanted to talk to them one at a time. She was directed to walk toward the bank building, and told that she would be contacted by the colored girl's boss. When no one approached her, she returned to the vehicle, and the colored girl stated that she would go find her boss. She denied seeing or carrying the blue bag containing the phony money. When the colored girl returned, she stated that her boss did not want to give the money to anyone that was not used to handling large sums of money. The colored girl asked them if they had any bank accounts, and she replied that she had a bank checking account in Texas. Mrs. Price said that she had at least $5,000.00 in a savings account. The colored girl asked her if she could prove it, and Mrs. Price stated that she would go to the bank and show her. They all walked toward the bank, and she did not notice the colored girl was not with them until they got into the coffee shop. She testified that Mrs. Price kept insisting that she go into the bank with her, and that she got mad, and said, "I don't want to have anything to do with you, and I'm not going to, I'm going home." She left the bank, and walked approximately one-half block up the street and observed the colored girl walking toward her. As the colored girl approached within three or four feet of her, a man grabbed her arm, and said, "You're under arrest."

The first proposition asserts that the intended victim was going to willingly surrender the money to defendant, which would be consent to the taking, thus negating the crime of Larceny by Fraud. We cannot agree with defendant's conclusion. In Hagan v. State, 76 Okl.Cr. 127, 134 P.2d 1042, we stated in the Syllabi Five through Eight of the Court:

"It is a well-settled general rule that the requirement of a felonious taking against the will of the owner is sufficiently met, and that larceny is committed, where a person intending to steal another's personal property obtains possession of it, although by or with the consent of the owner, by means of fraud or through fraudulent trick or device, and feloniously converts it pursuant to such intent.

"The distinction between 'larceny' and 'false pretense' is a very narrow margin. The character of the crime depends on the intention of the parties. If the owner parts with the 'possession' and 'title' of the property 'voluntarily,' it is not larceny. If the owner is induced to part with possession by fraud and misrepresentation and the title to the property does not pass, and there is a fraudulent intent at the time to appropriate the property to one's own use and deprive the owner thereof, it is larceny.

"Where one seeks to entrap another whom he suspects intends to steal his property, he has the right to do so under the law. But in so doing he should not do anything that will amount to the giving of his consent to the taking of the property.

"The setting of such trap must not go further than to afford the party opportunity to carry out his purpose, formed without inducement on the part of the owner of the property."

In the instant case, the defendant attempted to obtain $5,000.00 from the victim under the pretense that it was good-faith money, which would be returned to her, along with a share of the $20,000.00, which in fact, the defendant intended to obtain the victim's $5,000.00, by fraudulent representation, and then to convert the money to

defendant's own use. If the scheme had been consummated, it would have constituted the offense of Larceny by Fraud.

Defendant further argues under this proposition that the trial court improperly defined "Larceny by Fraud" in their Instruction Number Five. Although this portion of the proposition is improperly before this Court, in that the defendant did not object to the court's instructions, nor did he offer written requested instructions, we observe that the court's definition of "Larceny by Fraud" is taken verbatim from the Third Syllabus of Braswell v. State, Okl.Cr., 389 P.2d 998. We, therefore, find this proposition to be without merit.

The final proposition contends that the "so-called attempt in the instant case was abandoned as a matter of law by the defendant." We observe that the State's evidence reflected that the defendant and the co-defendant, Davis, conspired to obtain $5,000.00, from the victim by fraudulent representations. The defendant first stated that there was money in the envelope, she called the victim and arranged the meeting for the following morning to discuss splitting the money; the defendant was observed by a police officer with the bag of phony money in her possession. Further, we note that the defendant suggested that the victim go to the bank and obtain the $5,000.00 good-faith money, the victim was to obtain the money and she was to turn it over to the defendants and the alleged attorney. The defendants were standing together outside the bank awaiting the delivery of the money, which was not delivered because of the intervention of the police officers. The evidence on behalf of the defendant reflects that she did not engage in a scheme with the co-defendant, Davis, but rather, that she was a victim of the same scheme, in that the defendant Davis attempted to obtain $4,500.00 cash from her. There is no evidence that the defendant abandoned her fraudulent attempt to obtain money from the victim, but rather, that she had no criminal intent.

We observe that the trial court correctly instructed the jury as to what constitutes an attempt as follows:

"1. An attempt to commit a crime consists of the following elements: First, the intent to commit the crime. Second, performance of some overt act toward commission thereof. Third, the failure to consummate its commission.

"2. Overt act is sufficient to complete offense of attempt to commit crime if it goes far enough toward accomplishment of offense to amount to commencement of its consummation.

"3. 'Attempt to commit crime' as distinguished from mere preparation consists of a direct movement toward consummation of intended crime after preparations have been made.

"You are instructed that an attempt to commit a crime consists of both the intent to commit the crime and a direct ineffectual act done towards its commission, which act will apparently result in the usual and natural course of events if not hindered by extraneous causes in the commission of the crime itself, and failure to consummate the crime itself." (Original Record No. 24)

See Dunbar v. State, 75 Okl.Cr. 275, 131 P.2d 116, and Nemecek v. State, 72 Okl.Cr. 195, 114 P.2d 492.

We are of the opinion that the evidence, if believed, supported every element of the crime of Attempted Larceny. In conclusion, we observe that the jury found the defendant guilty, and left the punishment to be fixed by the court. Prior to passing judgment, the court stated:

"THE COURT: Since the trial of this case, I have made some independent inquiries and investigation as to the background of this defendant, and I have found that the record is not very good." (Tr. 164)

The court, thereupon, sentenced the defendant to the maximum sentence. We have previously held that such independent

inquiries and investigations by the court are improper. See Ayers v. State, Okl.Cr., 484 P.2d 552, and 22 O.S., §§ 973, 974 and 975. It is, therefore, the order of this Court that the judgment and sentence is vacated, and that the cause is remanded for resentencing before a different trial court.

SIMMS, J., specially concurring.

BRETT, J., concurring in part; dissenting in part.

SIMMS, Judge (specially concurring):

I specially concur with the opinion of my colleague, Judge Bussey, regarding the final proposition raised by the defendant.

In the final proposition, defendant argues that the so-called attempt was abandoned as a matter of law.

This argument is supported neither by the evidence in the record nor by the law.

For a thorough and in-depth discussion of attempted larceny of the type described as "pigeon dropping" see 6 A.L.R.3rd 241, § 13, p. 277.

BRETT, Judge (concurring in part; dissenting in part):

I concur that this conviction should be reversed and remanded, but I must respectfully dissent to that part which affirms the conviction. I believe the defendant abandoned any intent to complete the crime.

Also, I disagree with the statement in the majority opinion which recites:

"The defendants were standing together outside the bank awaiting the delivery of money, which was not delivered because of the intervention of the police officer."

With reference to the actions of Mrs. Price and defendant, Officer Greeson testified:

"They left the coffee shop on the inside of the Fidelity National Bank. . . . They came into the—up to the information desk and stood there for a second and turned around and walked back out —went back out on the Harvey Street side and came around to the front of the bank."

He was then asked, "Then what did they do?" He replied, "They talked for a few minutes and Mrs. Price came into the bank and Mrs. Castor walked on down the street east of the Fidelity National Bank."

Defendant was arrested about a block from the bank. Mrs. Price's testimony is not precise as to exactly who was to take her money, indicating "them" or some unidentified lawyer. It appears Mrs. Price tried to get defendant to go with her to the bank teller's window for the money, but defendant did not and left Mrs. Price outside the bank. Mrs. Price did not know where defendant was going and had no instructions for surrendering the money to another party.

Even assuming a fraudulent larceny scheme, the purported crime had not sufficiently developed or was voluntarily abandoned in its early stage without any intervening foreign influences. Nor can it be said that it became impossible to carry out the scheme, prior to the moment the defendant abandoned the attempt. There was no irrevocable act by defendant toward the accomplishment of the crime; an unlawful intent coupled with futile gestures does not constitute a crime. Nemecek v. State, 72 Okl.Cr. 195, 114 P.2d 492 (1941).

Therefore, I must respectfully dissent to the results of this decision, which affirms the conviction.