### State of Vermont v. John B. Harrington

[260 A.2d 692]

No. 22-69

Present: Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.

Opinion Filed December 2, 1969

244

Patrick J. Leahy, State's Attorney, for the State.

Eric A. Schuppin, Essex Junction, and Natt L. Divoll, Bellows Falls, for Defendant.

Holden, C.J. The respondent John B. Harrington has been tried and found guilty of the offense of threatening to accuse Armand Morin of Littleton, New Hampshire, of the crime of adultery. The indictment charges that the threat was maliciously made with the intent to extort $175,000 and to compel Morin to do an act against his will in violation of 13 V.S.A. § 1701.

At the outset the respondent acknowledges that there is no serious conflict in the material evidence presented to the jury. The main effort of his appeal challenges the jurisdiction and the sufficiency of the evidence to sustain the conviction.

At the time of the alleged offense the respondent was engaged in the general practice of law in a firm with offices in Burlington, Vermont. Early in March, 1968, he was consulted by Mrs. Norma Morin, the wife of the alleged victim, Armand E. Morin. Mrs. Morin had separated from her husband because of his recent and severe physical abuse. Prior to their separation they owned and operated the Continental 93 Motel in Littleton, New Hampshire, where the Morins maintained a residential apartment. The respondent learned the marital estate of the parties had a net value of approximately $500,000. Mrs. Morin reported to the respondent that her husband had also been guilty of numerous marital infidelities with different

women at the motel. Mrs. Morin also disclosed that she had been guilty of marital misconduct which apparently had been condoned.

During the first conference the respondent advised Mrs. Morin that, because of her residence in New Hampshire, she could not undertake divorce proceedings in Vermont for at least six months and for her to obtain a divorce in New Hampshire it would be necessary that she obtain counsel from that state. Mrs. Morin indicated she wished to retain Mr. Harrington to represent her.

On one of the subsequent conferences a friend of Mrs. Morin's, who accompanied her to the respondent's office, suggested that an effort should be made to procure corroborative evidence of Mr. Morin's marital misconduct. To this end, the floor plan of the motel was discussed and a diagram prepared. At this time a scheme was designed to procure the services of a girl who would visit the motel in an effort to obtain corroborative evidence of Morin's infidelity.

After some screening, a Mrs. Mazza, who had been suggested by the respondent, was selected to carry out the assignment. The respondent explained to Mrs. Mazza the purpose of her employment and the results she was expected to accomplish and provided her with a "cover story" to explain her registration and presence as a guest at the Continental 93 Motel. Warning Mrs. Mazza against enticement and entrapment, the respondent instructed the employee to be "receptive and available," but not aggressive. The agreement with Mrs. Mazza was that she would be paid one hundred dollars at the time she undertook the assignment and one hundred dollars when her mission was completed.

Mrs. Morin was without funds at the time. A contingent fee agreement was signed by Mrs. Morin and the firm of Harrington and Jackson, by the respondent. The agreement was dated March 5, 1968 and provided that in the event a satisfactory property settlement was obtained, the respondent's firm was to receive twelve and a half percent of the settlement, in addition to reimbursement for expenses advanced by counsel. Electronic listening and recording equipment was ordered and delivered by air.

On the afternoon of March 6 the respondent and two office associates traveled to St. Johnsbury in two vehicles. Mrs.

Mazza continued on to Littleton unaccompanied. She registered on arrival at the Continental 93 Motel under the name of Jeanne Raeder. She called the respondent at St. Johnsbury from a public telephone and informed him of her room number and location. Mrs. Mazza later delivered the key to her room to the respondent to enable him to procure a duplicate. The respondent, representing that he was a book salesman, registered at the motel and procured a room directly above that occupied by Mrs. Mazza. He was accompanied by a junior associate and an investigator,—both employed by the respondent's law firm.

During the next day Mrs. Mazza attracted Mr. Morin's attention. The sequence of events which followed led to an invitation by Morin for her to join him at his apartment for a cocktail. Mrs. Mazza accepted. Later she suggested that they go to her room because Mr. Morin's young son was asleep in his quarters. Morin went to Mrs. Mazza's room about midnight. Soon after the appointed hour the respondent and his associates entered the room. With one or more cameras, several photographs were taken of Morin and Mrs. Mazza in bed and unclothed. Morin grabbed for one camera and broke it.

During the time of her stay at the motel Mrs. Mazza carried an electronic transmitter in her handbag. By means of this device, her conversations with Morin were monitored by the respondent and his associates.

The respondent and his companions checked out of the motel at about one in the morning. Before doing so, there was a brief confrontation with Morin. According to Morin's testimony, the respondent demanded $125,000. Morin testified—"at that time I made him an offer of $25,000 to return everything he had, and in a second breath I retracted the offer."

The following day the respondent conferred with Mrs. Morin and reported the events of the trip to New Hampshire. He asked Mrs. Morin to consider reconciliation over the weekend. On March 11, 1968, Mrs. Morin informed the respondent she decided it was too late for reconciliation. With this decision, the respondent dictated, in the presence of Mrs. Morin, a letter which was received in evidence as State's Exhibit 1. The letter was addressed to Armand Morin at Littleton, New Hampshire, and was placed in the United States mail at Burlington the same day.

The communication is designated personal and confidential.

The following excerpts are taken from the full text:

"—Basically, your wife desires a divorce, and if it can be equitably arranged, she would prefer that the divorce be as quiet and as undamaging as possible.

This letter is being written in your wife's presence and has been completely authorized by your wife. The offer of settlement contained herein is made in the process of negotiation and is, of course, made without prejudice to your wife's rights.

It is the writer's thinking that for the children's sake, for your sake, and for Mrs. Morin's sake, that neither the courts in New Hampshire nor in Vermont should become involved in this potentially explosive divorce. If a suitable 'stipulation or separation agreement' can be worked out, the writer would recommend a Mexican, Stipulation-Divorce. This divorce would be based upon the catch-all grounds 'Incompatability'. A Mexican divorce of this type can be obtained when both parties have agreed as to terms of separation and have executed certain powers of attorney, etc., which this office can provide. With incompatability as the grounds, it is actually immaterial who goes down for the 48 hour period necessary to obtain the divorce in the State of Chihuahua. Mrs. Morin is willing to go; however, if a settlement can be reached, she has no objection to your going.

Mrs. Morin is willing to give up the following:

1. All of her marital rights, including her rights to share in your estate.

2. All of her right, title and interest, jointly or by reason of marital status, that she has in and to, any or all property of the marriage, including the Continental 93 Motel, the three (3) farms in Vermont, the capital stock that you own, the house in Lindenville, the joint venture in land in East Burke, all personal property except as is specifically hereinafter mentioned and in short, all rights that she may now have or might acquire in the future, as your wife. Furthermore, any such settlement would include the return to you of all tape recordings, all nega-

tives, all photographs and copies of photographs that might in any way, bring discredit upon yourself. Finally, there would be an absolute undertaking on the part of your wife not to divulge any information of any kind or nature which might be embarrassing to you in your business life, your personal life, your financial life, of your life as it might be affected by the Internal Revenue Service, the United States Customs Service, or any other governmental agency.—"

The letter goes on to specify the terms of settlement required by Mrs. Morin, concerning custody of the minor child, her retention of an automobile and the disposition of certain designated personal effects. It further provides:

"5. Mrs. Morin would waive all alimony upon receipt of One Hundred Seventy Five Thousand Dollars ($175,-000)—."

The sum of $25,000 is specified to be paid at the signing of the separation agreement, with the balance due according to a schedule of payments over the period of eighteen months.

The letter continues:

"—At the present time Mrs. Morin is almost without funds. She did have the $200 that you gave her when she left and she does have the $1500 in Canadian bills from the 'found' money. Because of her shortage of money, and, because she is badly missing David, and finally, because she cannot continue for any substantial period of time to live in the present vacuum, the writer must require prompt communication from you with respect to the proposed settlement contained herein. This letter is being dictated on March 11 and you should have it in your possession by March 13, at the latest. Unless the writer has heard from you on or before March 22, we will have no alternative but to withdraw the offer and bring immediate divorce proceedings in Grafton County. This will, of course, require the participation by the writer's correspondent attorneys in New Hampshire. If we were to proceed under New Hampshire laws, without any stipulation, it would be necessary to allege, in detail, all of the grounds that Mrs. Morin has in seeking the divorce. The

writer is, at present, undecided as to advising Mrs. Morin whether or not to file for 'informer fees' with respect to the Internal Revenue Service and the United States Customs Service. In any event, we would file, alleging adultery, including affidavits, alleging extreme cruelty and beatings, and asking for a court order enjoining you from disposing of any property, including your stock interests, during the pendency of the proceeding.

The thought has been expressed that you might, under certain circumstances, decide to liquidate what you could and abscond to Canada or elsewhere.. The writer would advise you that this would in no way impede Mrs. Morin's action. You would be served by publication and under those circumstances, I am very certain that all property in New Hampshire and in Vermont, would be awarded, beyond any question, to Mrs. Morin.

With absolutely no other purpose than to prove to you that we have all of the proof necessary to prove adultery beyond a reasonable doubt, we are enclosing a photograph taken by one of my investigators on the early morning of March 8. The purpose of enclosing the photograph as previously stated, is simply to show you that cameras and equipment were in full operating order.—"

It was stipulated that the letter was received by Morin in Littleton, New Hampshire "in the due course of the mail."

Such is the evidence upon which the respondent was found guilty. The first question is whether our courts have jurisdiction of the offense.

█ Our statutory law of crimes and criminal procedure subjects to punishment—"a person who, with intent to commit a crime, does an act within this state in execution or part execution of such intent, which culminates in the commission of a crime either within or without this state—." The offender is responsible for such crime in this state in the same manner as if the full offense had been committed entirely within this jurisdiction. 13 V.S.A. § 2.

The respondent advances the argument that if his acts constitute a crime, the offense is against the state of New Hampshire rather than Vermont. He contends that since his conduct affected persons and property in that jurisdiction, the

courts here are without jurisdiction to entertain the prosecution.

■■ It is not essential to criminal responsibility that the accused do every act necessary to accomplish the crime within the jurisdiction where he is prosecuted. *Strasshein* v. *Daily,* 221 U.S. 280, 55 L.Ed. 735, 738; *State* v. *Jost,* 127 Vt. 120, 124, 241 A.2d 316. Where the crime is composed of an interstate series of acts, it is jurisdictionally competent for a state to attach legal consequences to any overt act committed within its boundaries, even though the final impact and injury may occur elsewhere. *People* v. *Zayos,* 217 N.Y. 78, 111 N.E. 465, 466; *People* v. *Botkin,* 132 Cal. 231, 233, 64 Pac. 286; See Leflar, Conflict of Laws § 103.

This concept of criminal jurisdiction is entirely consistent with *People* v. *Werblow,* 241 N.Y. 55, 148 N.E. 786, cited by the respondent. The indictment there charged three brothers with grand larceny by false pretenses. The crime was planned in New York. It was carried out in London where the money was delivered to one of the conspirators.

The New York Court of Appeals was called upon to construe a section of the New York Penal Law similar to our 13 V.S.A. § 2. In its opinion by Judge Cardozo, a crime is not committed wholly or partly in New York within the statute "unless the act within this state is so related to the crime that if nothing more had followed, it would have amounted to an attempt. —The act, not the mere word, is still the test of jurisdiction." *People* v. *Werblow, supra,* 148 N.E. at 790–791.

■ So it is in the case at hand. When the respondent mailed the letter to the intended victim the overt act, designed to accomplish the ultimate purpose, was committed. The communication left his control. And with the mailing, the ability to revoke or interrupt was out of reach.

The extortion failed but the attempt was made. 13 V.S.A. § 9; *State* v. *Ciocca,* 125 Vt. 64, 74, 209 A.2d 507; *State* v. *Woodmansee,* 124 Vt. 387, 391, 205 A.2d 407; *State* v. *Hurley,* 79 Vt. 28, 30, 64 A. 78. Since the crucial act was done here, our courts have jurisdiction to determine whether it was done with a criminal purpose.

In this connection, it is well to look at the text upon which the indictment at hand was presented. 13 V.S.A. § 1701 provides:

A person who maliciously threatens to accuse another of a crime or offense, or with an injury to his person or property, with intent to extort money or other pecuniary advantage, or with intent to compel the person so threatened to do an act against his will, shall be imprisoned in the state prison not more than two years or fined not more than $500.00.

■ The gist of the offense is the attempt to extort money or other gain. *Commonwealth* v. *Corcoran*, 252 Mass. 465, 148 N.E. 123, 127. It was not essential to the crime, described in the statute, nor to the court's power to deal with it, that the threat be communicated in Vermont. The instruction, sought by the respondent to the contrary when the case was submitted, was correctly denied.

The respondent claims the trial of the case in Vermont invades his right, protected by the Sixth Amendment of the Constitution of the United States, to trial in the State or district where the crime was committed. U.S. Const. Amend. VI. We find no authority to support this claim and none is cited.

■ In the federal jurisdiction, if crime is committed partly in one district and partly in another, the offender may be tried in either district. If it were otherwise, there could be a serious failure of justice. *Burton* v. *United States,* 202 U.S. 344, 50 L.Ed. 1057, 1074; See also, *In re Palliser,* 136 U.S. 257, 34 L.Ed. 514, 518. We think the Sixth Amendment applies to interstate criminal jurisdiction with the same force and effect. The evidence sustains the court's jurisdiction to try the offense.

The State rested its case without proving that adultery is a crime according to the law of New Hampshire. The State took the position that formal proof of the foreign law was not essential under 12 V.S.A. § 1699. However, apparently out of caution to avoid the possibility of reversible error, the prosecution moved to reopen its case to introduce the criminal statute of New Hampshire relating to adultery. The trial court, as a matter of discretion and on the arguments of counsel, granted the request over the respondent's objection.

The respondent claims an abuse of discretion. He contends that to permit the State to reopen its case to eliminate a pos-

sible shortage in proof furnished no justification for the ruling.

■ The change in the order of proof, even in a criminal case, is under the trial court's control. Unless that control works an undue hardship or results in prejudice to the accused, it will not be disturbed on appeal. *State* v. *Miner*, 128 Vt. 55, 258 A.2d 815, 822; *State* v. *Tatko*, 119 Vt. 459, 463, 128 A.2d 663.

■ On appeal, the burden of showing this consequence is on the appellant. *Dashnow* v. *Myers*, 121 Vt. 273, 279, 155 A.2d 859. His argument seems to be that his motion should have been considered on the state of the evidence at the time the prosecution first rested its case. It is the proper function of the court to conduct the trial without error which will adversely affect the interests of either party. If a situation develops which may produce a contrary result, it is the court's duty to cure the deficiency if it can be done without prejudice to the opposing party. The court's ruling, in seeking to remove a possibility of error in this respect, was appropriate to the situation presented at the time.

Turning to the other grounds advanced in the motion for acquittal, the respondent maintains his letter (State's Exhibit 1) does not constitute a threat to accuse Morin of the crime of adultery. He argues the implicit threats contained in the communication were "not to accuse of the CRIME of adultery but to bring an embarrassing, reputation-ruining divorce proceeding in Mr. Morin's county of residence unless a stipulation could be negotiated." (Brief of Respondent-Appellant, p. 13.)

In dealing with a parallel contention in *State* v. *Louanis*, 79 Vt. 463, 467, 65 A. 532, the Court answered the argument in an opinion by Chief Judge Rowell. "The statute is aimed at blackmailing, and a threat of any public accusation is as much within the reason of the statute as a threat of a formal complaint, and is much easier made, and may be quite as likely to accomplish its purpose. There is nothing in the statute that requires such a restricted meaning of the word 'accuse'; and to restrict it thus, would well nigh destroy the efficacy of the act."

The letter, marked "personal and confidential," makes a private accusation of adultery in support of a demand for a cash settlement. An incriminating photograph was enclosed

for the avowed purpose of demonstrating "we have all of the proof necessary to prove adultery beyond a reasonable doubt." According to the writing itself, cost of refusal will be public exposure of incriminating conduct in the courts of New Hampshire where the event took place.

In further support of motion for acquittal, the respondent urges that the totality of the evidence does not exclude the inference that he acted merely as an attorney, attempting to secure a divorce for his client on the most favorable terms possible. This, of course, was the theory of the defense.

■ The case presented by the State did not require the court to accept the hypothesis of innocence claimed by the respondent. The acts which he performed and the words that he wrote are established by direct and documentary evidence that is not contradicted. The doctrine of *State* v. *Levy,* 113 Vt. 459, 461, 35 A.2d 853, and *State* v. *Goodhart,* 112 Vt. 154, 158, 22 A.2d 151, advanced by the defense to the effect that the evidence must exclude every reasonable hypothesis except that the respondent is guilty, does not avail him. The rule applies only where the evidence is entirely circumstantial. *State* v. *Fox,* 123 Vt. 82, 85, 181 A.2d 74; *State* v. *Tatko,* 119 Vt., *supra,* at 465, 128 A.2d 663; *State* v. *Marston,* 82 Vt. 250, 251, 72 A. 1075.

The law affords him a presumption of innocence which attends him until the jury returns its verdict. 13 V.S.A. § 6502. As in all criminal causes, consistent with the right to trial by jury, it was within the province of the triers of the fact to accept the defendant's claim of innocence. After weighing all the evidence in the area of reasonable doubt, the jury might have been persuaded to infer that the accused acted without malicious intent. But the evidence contains the requisite proof to convince the jury to a contrary conclusion.

■ At the time of the writing, the respondent was undecided whether to advise his client to seek "informer fees." One of the advantages tendered to Morin for a "quiet" and "undamaging" divorce is an "absolute undertaking" on the part of the respondent's client not to inform against him in any way. The Internal Revenue Service, the United States Customs Service and other governmental agencies are suggested as being interested in such information. Quite clearly, these

veiled threats exceeded the limits of the respondent's representation of his client in the divorce action. Although these matters were not specified in the indictment, they have a competent bearing on the question of intent. *State* v. *Louanis, supra,* 79 Vt. at 467, 65 A. 532.

 Apart from this, the advancement of his client's claim to the marital property, however well founded, does not afford legal cause for the trial court to direct a verdict of acquittal in the background and context of his letter to Morin. A demand for settlement of a civil action, accompanied by a malicious threat to expose the wrongdoer's criminal conduct, if made with intent to extort payment, against his will, constitutes the crime alleged in the indictment. *Commonwealth* v. *Coolidge,* 128 Mass. 55, 58; *O'Neil* v. *State,* 237 Wis. 391, 296 N.W. 96, 135 A.L.R. 719, 724, and cases annotated at 729.

The evidence at hand establishes beyond dispute the respondent's participation was done with preconceived design. The incriminating evidence which his letter threatens to expose was wilfully contrived and procured by a temptress hired for that purpose. These factors in the proof are sufficient to sustain a finding that the respondent acted maliciously and without just cause, within the meaning of our criminal statutes. *State* v. *Muzzy,* 87 Vt. 267, 269, 88 A. 895; Compare, *State* v. *Sylvester,* 112 Vt. 202, 206, 22 A.2d 505. The sum of the evidence supports the further inference that the act was done with intent to extort a substantial contingent fee to the respondent's personal advantage.

The pronouncement of the jury, in resolving guilt against innocence, does not result from pyramiding inference on inference. Whether the letter threatened to accuse Morin of a crime must be determined from its text. The question of malicious intent similarly depends on the language of the letter. It can also be referred to extraneous facts and circumstances which occurred prior to the writing.

 A given state of facts, proven to the satisfaction of the jury, may support several separate conclusions without constructing one inference upon another. It was legally permissible for the jury to find the separate elements of the crime by independently reasoning these factors from the complete evidence. *State* v. *Fox, supra,* 123 Vt. 82, 86, 181 A.2d 74; *Ca-*

*pello's Admr.* v. *Aero Mayflower Transit Co.,* 116 Vt. 64, 67, 68 A.2d 913; *Huestis, Admr.* v. *Lapham Estate,* 113 Vt. 191, 198, 32 A.2d 115; *Gero* v. *John Hancock Mutual Life Insurance Co.,* 111 Vt. 462, 479, 18 A.2d 154. See also, 1 Wigmore, Evidence § 41 (3d Ed.).

The record sustains the court's jurisdiction to try the offense. The evidence of guilt is ample to support the verdict and the trial was free from errors in law.

*Judgment affirmed.*