Michael OTTE, Appellant (Defendant below),

v.

STATE of Wyoming, Appellee (Plaintiff below).

No. 4605.

Supreme Court of Wyoming.

May 3, 1977.

Joe R. Wilmetti, Public Defender, Sweetwater County, for appellant.

V. Frank Mendicino, Atty. Gen., Jerry M. Murray, Sr., Asst. Atty. Gen., and Frank R. Chapman, Law Clerk, Cheyenne, and Robert L. Bath, County Atty., Sweetwater County, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

ROSE, Justice.

This appeal is here following the jury's verdict finding the defendant-appellant-Otte guilty of blackmail and robbery and the court's entry of judgment and sentence on blackmail and grand larceny—the latter being a lesser-included offense within the crime of robbery.

In his appeal to this court, three main issues are raised:

1. Did the trial court err in receiving hearsay testimony, later striking it and instructing the jury to disregard?

2. Was there entrapment?

3. In the light of the alleged *"consent"* and participation by the victim, is a necessary element of the crimes for which defendant was sentenced missing, thereby rendering the evidence insufficient to convict?

The court will affirm the conviction for grand larceny and reverse the conviction for blackmail.

## FACTS

The facts related here are substantially as presented through appellant's brief.

On March 6, 1975, one Michael George Rooney, as undercover agent from the Wyoming Attorney General's Office, met the defendant-appellant, Michael Otte, at Jake's Bar in Rock Springs, Wyoming. From that day to the 14th day of March, 1975, they discussed, talked about and planned a robbery or blackmail plot against City Market of Rock Springs, Wyoming. The gist of the plan was that Rooney and Otte would place a telephone call to the manager of City Market and inform him that they were holding the manager's wife as a hostage and that unless he, the manager, placed the money from City Market in a bag and delivered it to the store's parking lot for Rooney and Otte to take, they would kill the manager's wife. Rooney kept other agents of the Attorney's General's Office, agents of the City/County Task Force of Rock Springs, and Mr. Robert Delozier (manager of City Market) informed of all the plans and discussions made and had by him and defendant-appellant. Mr. Delozier was informed of the general nature of the proposed threat—he was assured that no actual threat would be made and that his wife would be safe and protected—he was requested to mark some money for later identification—he was requested to cooperate with the agents—and he was advised that he did not have to go along with the plan unless he wished to do so. He was also told that there was some possibility that the plan to catch Otte in the larceny of the money could result in harm to him.

On the 14th day of March, 1975, according to the plan of agent Rooney and Otte, and according to the plan agreed to by Rooney—the remaining agents—and the manager of City Market, Rooney and Otte proceeded to the City Market parking lot. Rooney then crossed the street to a public telephone booth and, after Otte entered City Market, Rooney called the manager of City Market and, in substance, told him that he was with the Task Force people and to go ahead and cooperate and not to worry. In response to this call the manager, Delozier, placed the money in a bag according to previous directions of the agents and deposited it at the designated place in the parking lot, thereafter returning to the store. Rooney and Otte picked up the money, whereupon Otte was immediately arrested and charged.

The Amended Information filed herein charged the defendant Otte in three criminal counts. He was found guilty on Counts I and III.

Counts I and III read as follows:

## "COUNT I

"did unlawfully and feloniously demand of Robert Delozier, Manager of the City Market, Rock Springs, Wyoming, the removal of the sum of $150,000.00 from the safe of City Market, his employer, with menaces of personal injury to his wife, Lynn Delozier, by word of mouth, contrary to Section 6–147, Wyoming Statutes, 1957.

## "COUNT III

"did unlawfully, forcibly and feloniously, take from City Market of Rock Springs, Wyoming, money in an approximate sum of $50,000.00, by threatening to do harm to Lynn Delozier, wife of the Manager of City Market, Robert Delozier, and putting them in fear, contrary to Section 6–65, Wyoming Statutes, 1957."

Count I charged the defendant-appellant with the crime of blackmail[1], and Count III charges him with robbery.[2] He was found guilty of blackmail and robbery, although the trial judge entered judgment and sentence for blackmail and larceny[3], a lesser-included offense within the crime of robbery.

### Entrapment

■ The jury was properly charged on the entrapment issue, the court following our decisions in *Janski v. State,* Wyo., 538 P.2d 271, and *Dycus v. State,* Wyo., 529 P.2d 979. The jurors believed there was no entrapment—a decision which was theirs to make.

### Hearsay

During the trial, the State called the Field Supervisor of the Attorney General's Investigation Division to testify concerning Rooney's reports to him and his instructions to Rooney. This testimony was objected to as hearsay. The jury was admonished to disregard that portion of the witness' testimony and the defendant now complains that it was reversible error to have received it since it was impossible for the members to put the matter out of their minds.

■ We will not consider this issue, which is made without citation of authority. *Reed v. Wadsworth,* Wyo., 553 P.2d 1024. Further, no objection was made to the instruction complained of and we will not consider that issue, under our holding in, among other decisions, *Duran v. State,* Wyo., 546 P.2d 434, citing *Oldham v. State,* Wyo., 534 P.2d 107.

### Larceny

The jury returned a verdict finding the defendant guilty of robbery and the court, rather than following the verdict of the jury, found that the defendant was guilty of grand larceny, an offense included in the crime of robbery but carrying a lesser penalty.

1. Section 6–147, W.S.1957, defines the crime of blackmail as follows:

 "*§ 6–147. Blackmailing.*—*Whoever,* either *verbally* or by any letter or writing or any written or printed communication, *demands of any person, with menaces of personal injury, any* chattel, *money* or other valuable security; or whoever accuses or threatens to accuse, or knowingly sends or delivers any letter or writing or any written or printed communication, with or without a name subscribed thereto, or signed with a fictitious name, or with any letter, mark or designation, accusing or threatening to accuse any person of any crime punishable by law; or of any immoral conduct, which, if true, would tend to degrade and disgrace such person, or in any way to subject him to the ridicule or contempt of society; or to do any injury to the person or property of any one, with intent to extort or gain from such person any chattel, money or valuable security, or any pecuniary advantage whatsoever; or with any intent to compel the person threatened to do any act against his will, *is guilty of blackmailing,* and shall be imprisoned in the penitentiary for not more than five years." [Emphasis supplied]

2. Section 6–65, W.S.1957, defines the crime of robbery as follows:

 "*§ 6–65. Robbery generally.*—Whoever forcibly and feloniously takes from the person of another any article of value, by violence or by putting in fear, *is guilty of robbery, and shall be* imprisoned in the penitentiary not more than fourteen years."

3. Section 6–132, W.S.1957, 1975 Cum.Supp., defines the crime of grand larceny as follows:

 "*§ 6–132. Grand larceny.*—Whoever feloniously steals, takes and carries, leads or drives away the personal goods of another of the value of $100 or upwards, is guilty of grand larceny, and shall be imprisoned in the penitentiary not more than ten years."

 The crime of larceny was committed when the defendant took the money into his possession and started to leave the parking lot. The defendant urges that there could be no larceny because Mr. Delozier, the store manager, consented to the taking by delivering the bag of money to the place designated as requested by the defendant. The defendant correctly argues that as a general proposition, in order to commit the crime of grand larceny, there must be a taking of property without the consent of the owner. Under the facts of this case, and within the contemplation of the crime of grand larceny, the owner did not *consent* to Otte's taking his property. He placed the money there for the purpose of apprehending this defendant in the course of his committing a larceny. That is the only reason he put the money out—not because he was consenting to Otte's taking and appropriating it to his own use.

In denying a petition for rehearing in *Neel v. State*, Wyo., 454 P.2d 241, 242, we said:

"It is well settled that where a person by trick or fraud obtains possession of property intending at the time of obtaining the property to convert it to his own use, and does so convert it, the fraud is the equivalent of a felonious taking and the offense is larceny. Annotation 26 A.L.R. 381, 382. . . ."

█ Fraudulent conduct implies an act which is obnoxious to good morals. *First National Bank of Cheyenne v. Swan*, 3 Wyo. 356, 23 P. 743 (1890), 31 Am.St.Rep. 122.

█ Fraud vitiates the consent of the victim if the other elements of the crime are present. *State v. Jesser*, 95 Idaho 43, 501 P.2d 727, 735. It was said in *Jesser*, quoting from a "landmark" Massachusetts decision (*Commonwealth v. Barry*, 124 Mass. 325, 327 (1878):

" '. . . If the possession is fraudulently obtained, with intent on the part of the person obtaining it, at the time he receives it, to convert the same to his own use, and the person parting with it intends to part with his possession merely,

and not with his title to the property, the offence is larceny.' "

We agree with the rule expressed by the court in *Commonwealth v. Barry* and consider it applicable to the fact-situation in the case at hand. We have said essentially the same thing in *Neel v. State*, supra, where we said:

"In 'larceny' owner of the property has no intention to part with title therein *to the person taking it* although he may intend to part with possession, . . . " Ibid., p. 242.

The store manager, having been told by the officers of Otte's fraudulent and illegal scheme to steal his money, placed the money in the lot consistent with the fraudulent plan of Otte in an effort to aid the officers in apprehending Otte. In aiding the officers, the manager was consenting to part with the possession of his money but not the title.

The fact that he placed the money in the parking lot in his effort to aid the law officers does not in any way amount to such consent as to avoid the violation of the larceny statute. In this regard, see the annotation in 18 A.L.R. 146, 172, entitled, "Entrapment to commit crime with view to prosecution therefor," supplemented by annotations in 66 A.L.R. 478, 503, and 86 A.L.R. 263, 270.

It is said in 18 A.L.R., at page 172:

"It is well established that where the criminal design originates with the accused, and the owner does not, in person or by an agent or servant, suggest the design or actively urge the accused on to the commission of the crime, the mere fact that the owner, suspecting that the accused intends to steal his property, in person or through a servant or agent, exposes the property, or neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property, or avail himself of the facilities furnished, will not amount to a consent in law, . . . "

In the instant case, the owner of the stolen property, when he placed the money in the parking lot for the purpose of attempting to apprehend Otte—an endeavor he was well within his rights to undertake—did not consent to, nor did he intend to, part with its title—only its possession—in which circumstances there was no consent to the taking. The element of felonious taking was present—the crime was grand larceny.

### Blackmail

■ We hold that the evidence reflected by the record before us does not support a guilty verdict or judgment upon the charge of blackmail.[4] (See Note 1, supra, where the blackmail statute is set out in full.)

The part of the statute which contemplates the sending or delivery of a *writing* cannot be in issue in this appeal because the facts are clear that there was no sending or delivery of any writing.

■ Relevant, however, is the question of whether Otte, directly or indirectly, orally demanded money of Delozier, the store manager, by and with the use of threats. We find that he did not, and we further hold that communication of a threat, *as a threat,* to the intended victim is a necessary element of the crime of blackmail under our statute. No threat was ever communicated to Delozier, Otte's intended victim, and therefore the crime was not committed.

In the course of the trial, these exchanges took place:

Mr. Delozier testified:

"Q All right. No threats were made; were they? The officers simply told you there is a plan that some threats may be made or will be made, but were any actually made?

"A Not directly toward me.

\*　\*　\*　\*　\*　\*

"Q But there was [sic] no threats made to you; were there?

"A Not to me; no, sir."

Rooney, the undercover agent, testified:

"Q Let's go now to the day of the occurrence which supposedly constituted this crime. Did you read that note to Mr. Delozier? ["threat" note dictated by Otte to Rooney]

"A No, sir.

"Q Did anyone read that note to Mr. Delozier?

"A I believe he had some idea of what it was, in the content of it.

"Q He had—answer my question. Did anyone, to your knowledge, read that note to Mr. Delozier?

"A No, sir.

\*　\*　\*　\*　\*　\*

"Q Did Mike [Otte] threaten Mr. Delozier?

"A No, sir.

"Q Did Mike threaten Mr. Delozier's wife?

"A No, sir.

"Q Did anyone ever say to Mr. Delozier, 'We have—your wife is in danger and if you don't put out the certain sum of money something is going to happen to your wife'?

"A Not to my knowledge."

At still another juncture in his examination, the undercover agent, Rooney, was asked:

"Q Was a threat actually made to Mr. Delozier?"

His answer was:

"A No."

With respect to whether or not a threat was ever communicated to Delozier, State's witness Coursey of the Attorney General's Office [but a member of the City/County Task Force in Rock Springs at the time with which we are concerned] testified:

"Q To your knowledge, were any threats actually imparted to Mr. Delozier at any time by anybody? Now, understand, please, I'm not saying did somebody say to him, 'They are planning to make such and such a threat.' What I'm asking you is was an actual threat ever made to Mr. Delozier?

---

**4.** Justices RAPER and THOMAS dissent from the blackmail section of this opinion.

"A Not to my knowledge."

Agent Compton of the Attorney General's Office testified:

"Q Mr. Compton, to your knowledge were any threats actually imparted to Mr. Delozier?

"A No, sir."

Absent a writing the statute requires that the defendant verbally demand money of another person with menace. This bespeaks a communication—the delivery of a threat. The threat need not be communicated directly. It can be communicated by any number of third persons so long as it is given and received as a *threat*.[5]

In the instant matter, it is clear that Otte *intended* and even *attempted* to make a threat which would be delivered by Rooney to Delozier. Certainly, the nature of the communication he intended for delivery was such as to constitute a threat had it been received as such, but neither Rooney nor any other person communicated Otte's intended threat to Delozier. Instead, the agents advised Delozier that Otte had a plan to blackmail him and, under these circumstances, the communication simply amounted to an enlistment of the store manager's help in aiding Otte to carry out the intended larceny of the money.

It is said in 31 Am. Jur. 2d, Extortion, Blackmail, and Threats § 10, p. 907:

"A threat must be made in order to constitute the crime of blackmail . . . ."

It is further said in the same section:

" . . . A threat is defined to be a menace of such a nature as to unsettle the mind of the person on whom it is intended to operate, *and to take away from his acts that free voluntary action which alone constitutes consent* . . ." [Emphasis supplied]

 A threat must be made in such circumstances as would be expected to strike fear in the heart of the ordinary man or woman. As was said in *State v. Sondergaard,* Me.1974, 316 A.2d 367, 369, quoting from *State v. Hotham,* Me.1973, 307 A.2d 185:

"*State v. Hotham* stresses that, as thus substantively conceived, a 'threat' must involve more than a message of 'menace of destruction or of injury'; it is also an indispensable feature of a 'threat' that its 'promise of evil' must be in a context of circumstances by which it gives rise to reasonable likelihood that 'alarm' or 'fear . . . to his disquiet' will be induced in some person."

We embrace this rule. Applying it to the facts of record here, it can be said that the nature of the threat was indeed such as would have caused disquiet and anxiety in any man—but the threat was not received in circumstances under which the mentioned anxieties and fears for the safety of the intended victim's wife either did—could—or would arise. The existence of Otte's intended threat came to Delozier—not as a threat but as a part of a plan "to catch a thief"—a plan with respect to which *he* was one of the planners.

We hold that the communication of the threat of harm to another—no matter by how many mouths communicated—is the gist of the offense prohibited. There was no such communication here.

We reverse the trial court's judgment and sentence entered upon the jury's verdict finding the defendant guilty of blackmail, and affirm the judgment and sentence of that court which was entered finding the defendant guilty of grand larceny.

The case is remanded for resentencing.

RAPER, Justice, dissenting in part and concurring in part, with whom THOMAS, Justice joins.

I dissent in part and concur in part.

---

5. As long as the threat is communicated in a manner calculated to impel the victim to act upon it against his will, it matters not that it came to him through third persons. It is still a threat within the crime of blackmail. See 86 C.J.S. Threats & Unlawful Communications § 4.a, "In General," p. 794.

*Dissent—Blackmail*

I dissent from the holding that the crime of blackmail was not supported by the record. The potential result is that the majority has effectively aborted the usefulness of Wyoming's blackmail statute when a blackmail threat has been intercepted by means of police intervention. Law enforcement officers, for the purposes of pursuing a blackmail offense in the making, may not now take the known victim into their confidence. This removes a necessary control factor for the safety of the victim or victims and I question whether any responsible law enforcement officer is willing to assume that risk. The majority view requires that someone always believes he will be hurt in order for a successful prosecution to occur.

This, in turn, has taken away from the public and the individual victim the full protection to which they are entitled. All of the liberties do not belong to the criminal. The liberties afforded by the blackmail and larceny statutes are for the ordinary citizen to be free from threat of personal injury, loss of property and violence. The purposes of those statutes is an attempt to guarantee those freedoms to the public. The view of the majority has added a dimension of peril to the public, not protection, particularly under the facts of this case where the defendant's threat was intended for delivery only moments—four minutes—before the money was to be delivered. Police handling in this case, free of entrapment, gave time to intervene, prevent injury and apprehend the criminal, not only for larceny but also blackmail.

The scanty, abridged facts set out by the majority do not permit an adequate consideration of the blackmail issue. The principal witness against the defendant was an undercover operative or informer of the investigative staff of the State Attorney General's office, in Rock Springs as part of a combined state-county-city crime task force. He looked and dressed to appear a hippie-type, loitering around bars, picking up what information he could of illegal activities, primarily looking for sources of illicit narcotics.

About 10:00 p. m. on March 6, 1975, he was hanging around Jake's Bar when approached by the defendant wanting to know where in town he could pick up some dope. The defendant offered to buy a beer and they talked for a while until some other agents of the task force wandered in. Word of their presence circulated so the operative, Rooney, known to the defendant as Jason, and the defendant moved on to the A and D Bar, where conversation continued and association developed. At the latter place, after a couple of hours, the defendant inquired of Rooney whether he was interested in making some quick money, $60,000.00 to $100,000.00. It would involve a supermarket (City Market) "robbery" and make them both a lot of money, if Rooney had the guts and was willing to follow directions. That was as far as the scheme went that night.

They did not see each other until March 8. Rooney was then informed about the plan by defendant. They got into the defendant's Cadillac, drove to a taco stand across from the City Market, the defendant explained how he had been watching the market along with the manager and had noticed that a lot of payroll checks were cashed on Fridays. The defendant knew where the manager parked his car, the location of his office in the store, the first name of the manager's wife as well as other details and had decided that after 4:00 p. m. on a Friday, there would be substantial cash on hand, preparatory to check cashing.

Rooney on the following day, March 9, traveled to Cheyenne and reported these events to the field supervisor of the Attorney General's Division of Investigation and to its director. He was instructed to return and go along with the defendant's plans but under no circumstances was he to come up with any suggestions and should just follow directions.

On March 10 Rooney returned to Rock Springs. At defendant's home, more of the defendant's plan unfolded. The defendant's strategy, as related to Rooney, was

that around 4:00 p. m. on the Friday following, Rooney, from a 'phone booth across the street in the Safeway parking area, would telephone the store manager and read to him a note threatening to kill the manager's wife, if he did not take the money from the store safe, place it in a bag, set the bag in front of the manager's car, after which the manager would drive away for a prescribed period. Any failure to follow instructions or attempt to call the police or help was to result in his wife's death by knife. The defendant was to be stationed in the store, watch for the 'phone call, the packaging of the money and when it developed that the manager was doing as he was told, the defendant would leave the store, get in Rooney's waiting pickup truck, drive to a point near the manager's car and pick up the money when the manager drove off. They would then split and meet later in Las Vegas.

The exact wording of the threat was dictated to Rooney by the defendant. One draft did not satisfy the defendant so it was torn up and flushed down a toilet. The final draft—to the defendant's liking—was received in evidence.[1] Rooney tried to get the defendant to do the writing but defendant would have no part of it, probably to make sure that Rooney could read it over the 'phone, just as the defendant wished it to be.

The defendant and Rooney did not get together then until March 12, on which date the defendant wanted to and jointly they did go through a dry run. Rooney, with a watch given to him for use by the defendant, was to go from the City Market parking lot to the Safeway 'phone booth, call the store manager, say he had a wrong number, then hang up, read the note to himself and figure time elapsed, including that required to walk back to the City Market lot at a point where Rooney's pickup was to be parked. The defendant in the meantime went into the market to observe the store manager taking the call. The store manager testified to receiving the wrong number call. That was the strategy.

In the meantime, the director and field supervisor of the investigation division of the Attorney General's office, along with other agents, went to Rock Springs to keep track of the situation, arrange surveillance and develop an arrest plan. Rooney kept the state agency fully informed through secret meetings with an investigator. The state director disclosed the whole plot to the store manager on March 14, a few hours before it was to be executed, explained a real and possible danger to the manager's wife and asked if he wanted to assist in apprehending the defendant by following the planned instructions of leaving the money in the parking lot according to the scheme. The nature of the threat was explained; protection for his wife was promised. The store manager agreed to help. His testimony disclosed that while he was willing to go ahead with laudable motives, at the same time he did entertain a genuine fear for his wife's safety in the light of the menace of her death by knife if he failed to comply. Part of Mr. Delozier's testimony follows:

> "A I said I would help them; yes. They explained to me, of course, there would be a certain amount of danger involved in this, but I told them I would anyway.
>
> "Q How did you feel about the danger?
>
> "A Well, I was scared. I didn't believe them at first, that, you know. But I

---

1. The dictated threat was as follows:

 "Is this Bob Delozier—if you want your wife Lynn to live, listen closely. We have been watching you now, and you have just 4 minutes from the time I hang up to go to the safe—put the money in a bag, place the bag of money in front of the car, on the passenger side, of your car. Get into your car and drive to the post office, wait until 4:30, then you can report to the police. Any attempt to summon police or help from the store, and you will find Lynn razor slashed from her pussy to her throat. The insurance will replace the money, not your wife. . . . If anyone asks what your [sic] doing, tell them your [sic] returning the money to the bank, at bank's request to check for counterfeit bills. Cooperate and no one will be hurt, try that hero shit and Lynn will be opened up like a can of tomato soup. NOW—you got 4 minutes."

didn't—it didn't sink in what they were saying until, you know, for a minute, and then I was, of course, scared.

"Q What did you do after the conversation; what did you do?

"A As far as what?

"Q Well, did they inform you of what was to happen?

"A Yes, they told me that as far as they knew I would be receiving a phone call telling me that my wife had been abducted and that if I didn't take the money out of the safe and put it in a certain place or something like this, that she may be harmed.

\* \* \* \* \* \*

"Q Were you advised at that time or did you know at that time of the threats against your wife?

"A They said there would be threats against my wife, but I did not know what they would be as far as what the actual threats were, as far as whether she'd be harmed, killed or whatever; I don't know.

"Q Did they ask you once more whether you wanted to go ahead with this?

"A Yes. They said there was still time that we could drop, and I told them no, I wanted to go through with the actual event. They did tell me that they would not completely guarantee there would be no—that there would be no harm to me. They said they didn't know, but I went ahead anyway.

\* \* \* \* \* \*

"Q Now, Mr. Delozier, while you were putting the money in the bag, taking it from the safe, what thoughts were going through your mind?

"A Well, I was scared because like I say, I lost track of Mr. Otte and I didn't know where he went. And, of course, when I'm in the safe I had my back towards the liquor store, and, I don't know, I was just kind of, of course, afraid that maybe he would walk out of the liquor store and try to just take the money from me right there.

"Q Would you tell us the reasons for your taking the money out of the safe, placing it in the bag and placing it under the tire of the vehicle parked in the parking lot?

"A The reasons for this is because of the threats supposedly made towards my wife which she was supposedly at that time being watched by undercover agents or Task Force agents. But still I had thoughts of maybe, you know, he would get to her. And if he did get her, if there was no money out there, then what would happen to her?

"Q If not for the threats, would you have put the money out there?

"A No; no, I wouldn't just take money and put money out there if there was [sic] no threats."

Following are some excerpts from the testimony of Mr. Neil Compton, State Director, Investigation Division, Office of the Wyoming Attorney General:

"Q (By Mr. James) Now, going back to one other point. When you talked with Mr. Delozier at the City/County Task Force on the morning of the 14th, can you remember exactly what you told him with regard to any threats against he or his wife?

"A Yes, I can.

"Q Would you tell us what you told him at that time?

"A I told him that he very might possibly get into a situation where the suspect in this case would put a gun to his face and kill him. I told him that we were putting agents with his wife so that nothing could happen to her; agents with instructions under no circumstances was she to be taken hostage.

"I told him at that time that one of the possibilities that could happen is that all three of them could go, but that I highly doubted that. I mostly—quite frankly, we had control of the situation with the exception of

Mr. Delozier. Mr. Delozier, after talking and discussing all of the possibilities, although fairly upset at the time, decided to go along with it, stating that if he didn't get it out of the way this time that it would just happen anyway sometime, so he might as well give it a try. And in essence that's what he said, in those words.

"Q Did you ever tell him or imply to him what the threats were against his wife?

"A Yes, sir; I did.

"Q What did you tell him?

"A I told him that his wife—that the threats were that his wife would be killed by knife.

"Q Who decided that even though the threats were there he would go ahead with it?

"A He did, He's a very brave man."

On Friday, March 14, the operation proceeded exactly as arranged by the defendant. The only variation was that when Rooney made his call to the store manager, he identified himself as being with the task force, to go ahead and cooperate and not to worry. The blackmail note was not read. The defendant was in the store at a place where he could look into the manager's office, saw him take the money from the safe, place it in the bag and start out of the store. The defendant had previously been identified to the manager who observed that he was being watched and saw the defendant depart.

The defendant climbed in Rooney's truck, changed from a bright red stocking cap to a dark blue one and himself drove with Rooney as passenger. They went around the building to a point close to the location of the manager's car, observed him place the bag of money near the right front wheel and drive off. The defendant got out of the truck, picked up the bag containing $37,000.00, all of which had been marked with serial numbers recorded. The defendant ran back to the truck, threw in the money, climbed in and when about to drive off, law enforcement people swarmed around and the defendant was apprehended. Law officers had been stationed inside the market, all over the lot and on top of the store. All the defendant's moves were observed and photographed. After his arrest at the police station, following being warned of his constitutional rights by way of the Miranda warning, defendant admitted he had planned the operation.

The foregoing detail is a composite from all the evidence, construed as an appellate court usually does. On appeal of a criminal conviction, this court accepts as true the evidence favorable to the prosecution, leaving out of consideration entirely evidence of the unsuccessful defendant in conflict therewith, giving evidence of the State every favorable inference which may reasonably and fairly be drawn. *Shafsky v. State,* Wyo.1974, 526 P.2d 60; *Bentley v. State,* Wyo.1972, 502 P.2d 203; *Sims v. State,* Wyo.1972, 496 P.2d 185; *Harris v. State,* Wyo.1971, 487 P.2d 800; 3 West's Wyoming Digest, Criminal Law, ☜1144.13(3).

This court has not had occasion to consider a blackmail case. Though extortion and blackmail may be rather rare in Wyoming, it is a frequently prosecuted crime elsewhere and a substantial body of law has been accumulated. While the circumstances of this case may seem bizzare and perhaps unbelievably brazen, such seems to be a characteristic of the crime. Police presence setting a snare to catch the offender is an effective aid. If police assistance were not available and authorized, many offenders would be permitted to escape [2] as could

---

**2.** Police assistance is often utilized in extortion threat cases. Following are only two of many examples, some of which are cited in this dissent without discussing entrapment aspects:

In *People v. Babic,* 1972, 7 Ill.App.3d 36, 287 N.E.2d 24, caller threatened harm to two sons of victim. Police notified and recorder placed on 'phone. Instructions for delivery of demanded money were given. Marked currency was placed in bag. Victim placed bag while observed by police. The defendant drove by, picked up bag, placed it in car and was arrested. Photos of the action were taken. No entrapment.

have happened here.

The majority opinion is premised upon an inconsistency. I would point particularly to the language where it is recited:

" * * * The defendant urges that there could be no larceny because Mr. Delozier, the store manager, consented to the taking by delivering the bag of money to the place designated as requested by the defendant. * * * "

The majority relies upon the circumstances just recited in disposing of the larceny count using a theory that assumes a "demand" by defendant. The demand was not communicated any more than the menaces were, and if the menaces were not communicated for purposes of blackmail, there is a real difficulty reconciling that with how the demand was transmitted for purposes of the larceny conviction.

Furthermore, the majority opinion, if followed to a logical end, does permit Delozier to cooperate with the law enforcement officers in apparently acquiescing with defendant's scheme for purposes of the larceny count, but rules, in a blackmail context, if that occurred, the offense cannot be committed because under those circumstances, the menace never can be communicated as a threat.

To me, the majority opinion makes it clear that once police intervention is present, no matter how the information were made available to the potential victim, it no longer is a threat or menace because

of the presence of the officers. If that analysis is correct, it would do no good to actually deliver the blackmail message, as planned, because whatever the blackmailer intended cannot be received.

The statute prohibiting threat is applicable even though the threat is not made directly to the victim. *State v. Knight,* 1976, 219 Kan. 863, 549 P.2d 1397; *Lenoir v. State,* 1951, 197 Md. 495, 80 A.2d 3. It is immaterial whether a threat is directed against the person to whom it is communicated or is directed against another, so long as the threat is made to extort money. Any other holding would immunize a blackmailer with sufficient intelligence to avoid making a personal threat. *State v. McInnes,* Fla.App.1963, 153 So.2d 854.[3]

The threat must be one that may overcome the ordinary free will of a firm and prudent man and induce him to part with his money and it is of no importance that the purpose be not accomplished. *State v. Morrissey,* 1951, 11 N.J.Super. 298, 78 A.2d 329. A threat to harm a member of the victim's family will support a conviction for extortion. *People v. Babic,* supra, note 2; *State v. Wilkinson,* 1969, 17 Ohio St.2d 9, 46 Ohio Op.2d 114, 244 N.E.2d 480, cert. den. 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465. The threat was real. The evidence, believed by the jury, supports a conviction. The whole issue was the credibility of the witnesses and that was solely and peculiarly within the province of the jury.

Under § 6–147, W.S.1957,[4] the crime of blackmail is complete when threat is made

In *People v. Heard,* 1969, 19 Mich.App. 516, 172 N.W.2d 889, the victim received calls from defendant extortionist, police were notified and present when the money was dropped off at a designated rendezvous point. The final 'phone call of instructions by the extortionist and the defendant retrieving the bag were observed by the police. The court held such sufficient to convict and no entrapment.

3. In *Gurley v. United States,* D.C.App.1973, 308 A.2d 785, the victim had called the police because of previous threats. The 'phone rang; defendant called; victim handed 'phone to policeman then present. Defendant said, "If you call the police or cause me any trouble, I'm going to kill you, Thelma, and then I'll burn down that God damn apartment." The court held that a statute similar to that in Wyoming

does not require that threats be communicated directly to the threatened individual. All the statute proscribes is that there be a threat to do bodily harm. The threat was intended to be conveyed to the victim but because of intervening cause not uttered to victim. As here, the defendant was not aware that the threat was not made as planned.

4. Blackmail, for the purposes of this case, is defined by § 6–147, W.S.1957, in pertinent part as follows:

"Whoever, either verbally or by any letter or writing or any written or printed communication, demands of any person, with menaces of personal injury, any * * * money * * * to do any injury to the person * * * of any one, with intent to extort or gain from

and imparted. The majority adopts a holding completely contrary to substantial authority when it declares that communication "is the gist of the offense prohibited." Proof of a threat by means of which money or something else of value is to be obtained is the essential element of the offense of extortion. *State v. Mancini,* 1971, 108 R.I. 261, 274 A.2d 742; *State v. Harrington,* 1969, 128 Vt. 242, 260 A.2d 692. The gravamen of the offense is the threat. *Smith v. State,* 1944, 207 Ark. 104, 179 S.W.2d 185; *Hilliard v. State,* 1955, 92 Ga.App. 294, 88 S.E.2d 425; *Iozzi v. State,* 1968, 5 Md.App. 415, 247 A.2d 758. The insidious act for which the law provides punishment is the threat. *Commonwealth v. Marino,* 1968, 213 Pa.Super. 88, 245 A.2d 868, cert. den. *Rispo v. Pennsylvania,* 395 U.S. 983, 89 S.Ct. 2145, 23 L.Ed.2d 771, and 397 U.S. 1077, 90 S.Ct. 1526, 25 L.Ed.2d 811, reh. den. 398 U.S. 945, 90 S.Ct. 1849, 26 L.Ed.2d 284; 3 Wharton's Criminal Law and Procedure (Anderson) § 1398, p. 796. The larceny which eventually ensued and which the majority is willing to approve, would not have occurred without giving of the threat, effect upon the victim.

The majority makes a unique concept of the gravamen of the offense when they hold that "communication" of the threat "is the gist of the offense prohibited." Gravamen of the offense is the grievance or injury specially complained of. Black's Law Dictionary, 4th Ed. Gravamen is defined by Webster as the material part of the grievance or charge. The gravamen of an offense and gist of an offense are synonymous. See also, *Williamson v. Pacific Greyhound Lines,* 1944, 67 Cal.App.2d 250, 153 P.2d 990, 991. As said by so many courts, the gravamen or gist of the offense of blackmail is the menaces of personal injury with intent to extort or gain money. Of course, the threat must be acted upon, as it was, and not remain just a dormant idea.

In the case before us, the defendant dictated the threat fully intending that the store manager act upon it. The store manager did respond as a result. It is inconceivable to me how the majority can conclude that the threat was not communicated. Every person involved taking any action culminating in the apprehension of the defendant was aware of the threat, including particularly Mr. Delozier, the store manager. Every facet of the crime was present, all because of the threat. It made no difference that Rooney, the operative, did not read the defendant's message. The manager knew of it. What Rooney's telephone call did do, however, was activate the defendant's intent to and did actually convey the threat for the purposes of blackmail. The defendant's threat to injure, to extort money, was confirmed by the telephone call by Rooney at the defendant's express instance. The gist of the offense is the threat to extort money. *State v. Harrington,* supra. It would have been only a transparent pretense and useless sham for Rooney to read a written threat of which the store manager was fully aware and to which he was responding—the only reason he was participating. The essence of the threat—to kill Delozier's wife by knife—was all necessary to be passed on to him. Nothing could be more sinister or menacing.

The majority has in effect given the defendant immunity from the design of his threat and, regardless of how said, has given something in the nature of the defense of entrapment, which it has held did not exist in this case. The majority is saying the defendant is innocent of any wrongdoing in initiating and carrying out—consummating—a plan of blackmail and painting him with the brush of purity and sweetness because the police permitted his plan to go forward unbeknownst to him. The defendant's "menaces of personal injury * * * with intent to extort or gain * * *

such person any * * * money, * * * is guilty of blackmailing, and shall be impris-

oned in the penitentiary for not more than five years."

money" remained constantly present as far as the defendant was concerned. The police protective action never changed that. Law enforcement officials never once originated or altered the total criminal scheme of the defendant and merely afforded opportunities and facilities for the commission of the offense by use of stratagems. *Janski v. State,* Wyo.1975, 538 P.2d 271; *Sorrells v. United States,* 1932, 287 U.S. 435, 53 S.Ct. 210, 212, 77 L.Ed. 413, 86 A.L.R. 249. The crime was completed, as intended, by means of the threat, though unsuccessful. The majority has created a strange and unusual defense to the crime of blackmail, which defies definition.

The majority, untroubled by facts to the contrary, opines that there could have been no fear instilled in the store manager because with the police in the picture, the matter had lost any reality. That also is an immaterial consideration. It is not necessary that fear actually be engendered in the intended victim. Our statute does not so require. It is only necessary that the statement made was of such a nature as to convey menace to an ordinary hearer "pregnant with the promise of evil." *State v. Lizotte,* Me.1969, 256 A.2d 439; *Postell v. United States,* D.C.App.1971, 282 A.2d 551; *State v. Cruitt,* 1968, 200 Kan. 372, 436 P.2d 870; *People v. Robinson,* 1933, 130 Cal.App. 664, 20 P.2d 369.

A threat must be made in the context of circumstances by which it gives rise to a reasonable likelihood that alarm or fear to his disquiet and anxiety will be induced in some person. *State v. Sondergaard,* Me. 1974, 316 A.2d 367. What can be more impressive than the testimony of the victim, Mr. Delozier, that he was in every context of reality actually in fear and with just reason, even though there is no necessity, for the purposes of establishing the crime, that he have actual fear. Any reasonable person of any prudence at all would see there was menace in the defendant's threat and react with alarm, as the store manager did, even with the presence of police protection. The sequence of events, in which the defendant was a continual participant, was set in motion by the communication. Without a communication, there can be no response. There was a completely consummated crime of blackmail. To conjure up the absence of communication of the threat is to journey into the land of make-believe.

The blackmailer's stock in trade is fear. Once that stock has been displayed, as it was here to Rooney, reason demands that his business be disrupted even though he cannot effect a particular sale because his victim has been warned.

### Concurrence

I fully agree that the defendant presented no ground for reversal on those issues involving entrapment, hearsay and larceny. However, it is my view that more should be said in regard to the hearsay and larceny questions.

### Hearsay

I am left with the impression by the majority opinion in its summary disposition of the hearsay issue that it is approving the trial court's action in giving an instruction to disregard. More complete facts are necessary to bring my concern into focus.

During the course of the trial, the State called the field supervisor of the Attorney General's investigation division, to testify as to agent Rooney's continuing reports to him and his instructions to Rooney to follow the defendant's directions, take no initiative and make no suggestions. Over defendant's continuing objection that the content of the reports was hearsay, the witness was permitted to testify as to what Rooney told him. Just before the trial judge read the usual formal package of written instructions to the jury, he instructed as follows:

"Ladies and gentlemen of the jury, the Court has determined as a matter of law that a portion of the testimony should be stricken and discarded at this time by the jury. I refer to the portion of the testimony of Mr. Quarberg who was the second witness, and the portion of his

testimony that I refer to is his report to Mr.—his testimony as pertaining to reports he received from Mr. Rooney [Jason] who was the first witness. And it's the ruling of the Court that the reports made by Mr. Rooney to Mr. Quarberg should be stricken and that the jury is instructed to disregard this particular area of testimony."

There was no reason to strike the testimony and instruct the jury to disregard. As pointed out by the county attorney and appearing in the record, the testimony was being given, not to prove the truth of the facts related in the reports, but only for the limited purpose of establishing what was reported. I see the purpose to be only corroboration of Rooney as to what he reported to whom. For that, the truth of the statements attributed to Rooney was not an issue as far as the witness was concerned. VI Wigmore, Evidence, § 1766, pp. 250–253 (Chadbourn rev. 1974); *Hutchins v. State,* Wyo.1971, 483 P.2d 519.

In that connection, also, the county attorney appropriately pointed out that the person quoted was (1) *present,* (2) *available for cross-examination,* (3) *under oath,* all the requirements of a witness. The rule against hearsay is designed to insure compliance with those conditions and when one is absent, only then does the hearsay objection become pertinent. McCormick on Evidence, 2d Ed. HB, § 245, pp. 581–582. The person quoted by the witness was before the court as a witness, so the reason for the rule failed. The witness reporting what was said and the declarant were both present and available for confrontation by the defendant.

There was no need for the special instruction by the trial judge. If he wanted to limit and explain to the jury that the testimony of Rooney's statements to his superior was not being received for their truth but only to show that they were made, then an instruction along that line could be appropriate. See Rule 105, Federal Rules of Evidence, dealing with limited admissibility. Any prejudice resulting from striking the

testimony was to the State not the defendant. The defendant received a bonus. The trial judge, the bar and those others concerned should not be left believing that under the circumstances of this case, such an instruction should have been given and that such practice should be followed under all similar circumstances in the future.

*Larceny*

While I concur completely with the result reached and all that has been said by the majority in upholding the conviction of the defendant for larceny, it seems to me that the users of the opinion in this case should have the benefit of recent and other decisions following the A.L.R. authority cited, illustrating the principle involved.

In *United States v. Bryan,* 3 Cir. 1973, 483 F.2d 88, the court held that even though an FBI agent instructed a shipping line to permit a defendant's taking of a shipment of Scotch whiskey from a pier with false documents and a truck painted to represent that of the consignee, there was a larceny. The defendant claimed consent. The court stated that the relevant question involves not the state of mind of the owner or person in control of the goods but rather the felonious state of mind of the defendant.

In *State v. Schimkat,* 1972, 86 S.D. 523, 199 N.W.2d 37, the defendant, while store employees were otherwise engaged, removed a TV set and placed it in a trash can behind the building, covering it with a piece of cardboard. An employee discovered it there and returned it to the inside of the store. The proprietor notified the police and he was requested that it be returned to the trash can for police surveillance. The defendant returned after the store closed, removed the cardboard, placed the TV set on the back seat of his car and was then apprehended. The defendant argued that the set was taken with the consent of the owner and therefore no larceny. The court held that the asportation was without the consent of the owner and only furnished additional evidence. The court also ex-

plained that under such circumstances, the claim of consent is akin to a claim of entrapment and ruled that when officers merely furnish an opportunity for a dishonest person to steal and lie in wait in anticipation of a taking, there is no entrapment.

In *Odom v. Sheriff, Clark County*, 1972, 88 Nev. 315, 497 P.2d 906, a plainclothes police officer placed himself in the front seat of a car, feigning drunkenness as a part of a set-up to catch parking lot thieves. When the defendant reached into a pocket not containing money, the officer changed position in order to expose a pocket with money. The defendant reached into that pocket, removed the money, fled and was apprehended in flight by other officers. The defendant claimed consent of the owner. The court stated that while the officer's cooperation made the removal less difficult, there is nothing to show that cooperation amounted to consent since the criminal intent originated with the defendant; changing position in the seat only improved the opportunity for the defendant to consummate the crime.

The defendant in *State v. Snow*, 1953, 98 N.H. 1, 93 A.2d 831, was a police officer. The chief of police wished to test his honesty so arranged with a restaurant owner to leave marked bills in the cash register and allow the back door to remain unlocked. Officers were stationed to observe. When defendant entered the restaurant, he was apprehended with the bills on his person. The officer claimed consent. The court held that no one had implanted the idea in the officer's mind nor suggested he enter the restaurant, much less take the money from the cash register; the crime was not created by the police department; all the police did was create the opportunity and under those circumstances, there was no valid consent nor entrapment.

In *Jarrott v. State*, 1927, 108 Tex.Cr. 427, 1 S.W.2d 619, a witness testified that he had been approached several times to assist the defendant in stealing cars. The witness informed the police of the defendant's desire to steal a car on a certain night. The police asked the witness to go with the defendant. The owner of the car cooperated by leaving the keys in the vehicle. An officer was concealed in the rear of the vehicle. The defendant was arrested when he was haggling with a buyer over the price. The court held that consent of the owner under such circumstances to let his car be used as bait, where wholly for the purpose of apprehending the thief, was not such consent as would relieve the defendant, where the criminal design originates with the defendant and not the owner or police.

Where the owner only gives access to the property and affords an opportunity to commit larceny, there is no consent to the taking nor suggestion that it should be taken. As long as the owner only makes everything ready and easy, waits passively and lets the criminal perpetrate the offense for himself, there is no consent and no entrapment. *Hagan v. State*, 1943, 76 Okl.Cr. 127, 134 P.2d 1042; *State v. Herschberger*, 1945, 160 Kan. 514, 163 P.2d 407.

I would have affirmed the district court in every respect. Justice Thomas has authorized me to state that he joins in this dissenting and concurring opinion.