No. 48,158

STATE OF KANSAS, *Appellee*, v. HAROLD KNIGHT, *Appellant.*

(549 P. 2d 1397)

Opinion filed May 8, 1976.

*Fred W. Phelps,* of Topeka, argued the cause, and was on the brief for the appellant.

*Raymond W. Radford,* of Chanute, argued the cause, and *Curt T. Schneider,* attorney general, was with him on the brief for the appellee.

*Per curiam:*  This is an appeal in a criminal action in which the jury found the Reverend Harold Knight (defendant-appellant) guilty of communicating a terroristic threat to a female parishioner, Anna May Walker.  The principal question asserted on appeal is whether the appellant may be found guilty under K. S. A. 21-3419 by communicating a threat of violence allegedly made by another (that his wife had purchased a gun and intended to kill Anna May Walker).

Harold Knight is a Baptist preacher at the Wilson Avenue Baptist Church in Chanute, Kansas. The appellant became embroiled in what his counsel characterizes as a "church fight." The record discloses the church fight started or was heated by a controversy between the appellant and a doctor and the Neosho Memorial Hospital.

On May 16, 1974, the appellant and Anna May Walker, the complaining female parishioner, had a dispute at the appellant's house over his controversy with the doctor. On May 17, 1974, following the dispute between the appellant and Anna May Walker, the ap-

pellant's wife bought a gun, allegedly without the appellant's knowledge.

On Sunday, May 19, 1974, the appellant announced from the pulpit his personal confrontation with the doctor and the hospital was his personal business, and he didn't want any advice. Anna May Walker and three other church members took offense at his remarks and walked out. The appellant's wife, who had recently undergone surgery, was very upset and nervous after the service. She told the appellant about the gun and said she was afraid she would "do something." The appellant testified he then went into the church office and called Anna May's father, Ocie Beck. The appellant testified he merely informed Ocie Beck that Janice had purchased a gun and asked Ocie to ask Anna May to stay away from the appellant's house.

Mr. Beck testified Reverend Knight in a loud and vicious tone said that Janice, his wife, bought a gun last week and she was going to kill Anna May for what she did this morning. When Mr. Beck asked if Janice was with Reverend Knight, he was alleged to have said, "No, she is in the car hunting for Anna May with the gun."

When Mr. Beck told Anna May about the conversation she had a police officer search her home before she entered.

Anna May testified that on May 20, 1974, she was informed the appellant had called and wanted her to call him back. Anna May went to the Chanute Police Department to return the appellant's call because she wanted someone with authority to hear the threats being made over the phone. Officer Ogden of the Chanute Police Department was working as a dispatcher and had other duties to perform, but testified he overheard part of the conversation where the appellant told Anna May "his wife had purchased a gun and was after her ass" and that "he would get even with her if he had to do it through her parents."

Anna May related the conversation as follows:

". . . 'Harold, I understand Janice has a gun and is going to kill me.' And he said: 'Yes she is.' I told him that if either he or Janice comes at me with a gun you're going to eat the bullets and all. Defendant replied: 'You will eat it you Dirty Bitch, I'm going to catch you somewhere and beat the living shit out of you.' I also said that I didn't care what he did to me but I wanted him to leave my mother alone, because she has a heart condition and that she can't stand this kind of stuff. I told Harold that he was going to cause my mother to have a heart attack and that he was going to kill her. Harold said, 'Yes, I'll kill your mother to get back to you.' Then I hung up on him. The tone of defendant's voice was very angry and hateful."

Anna May testified she was terrorized to such a degree she stayed up until two o'clock that night and stayed away from her home for ten days except when her husband was home.

The appellant related his conversation with Anna May as follows:

". . . When Mrs. Walker called me, or returned my call, she said: 'I understand Janice has a gun.' I said: 'Yes, Anna May, that's right. She has a gun, and I don't want any problems. I'm going to ask you to let Janice have a chance to recover. She's very upset. She's been through a terrible problem of health and you have a mother who has had a health problem. You know what this is. And my children—the mother of my children have as much right to recover as you would expect for your mother. You know what these conditions are. You're not foreign to it.' . . ."

He denied threatening Anna May in any way but admitted he did call her a bitch.

For the purpose of attacking Anna May's credibility, the appellant presented testimony indicating Anna May had written bad checks, and owed money to Avon and Frito Lay, her husband's employer. Anna May and her husband denied any wrongdoings.

Patricia Briley, who worked at the Neosho Memorial Hospital, testified that on Friday, May 17, the appellant told her that Janice had gone to buy a gun. She further testified on May 20, she overheard the appellant tell Anna May, "I don't care if I do kill your mother as long as I get back at you." This witness's credibility was also attacked by the appellant.

The appellant was charged with two counts of communicating a terroristic threat, one for the May 19 telephone call to Ocie Beck and one for the May 20 telephone conversation with Anna May Walker. The second count in the information read:

"That on or about the 20th day of May, 1974, in the County of Neosho and State of Kansas, HAROLD KNIGHT, then and there being, did then and there unlawfully, willfully and feloniously communicate a threat to commit violence with intent to terrorize another, to wit: ANNA MAY WALKER, by informing ANNA MAY WALKER that his wife, JANICE KNIGHT, had purchased a gun and intended to kill the said ANNA MAY WALKER, in violation of K. S. A. 1973 Supplement 21-3419, and all contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas."

The jury found the appellant guilty of the second count, but not guilty of the first count.

Many points asserted on appeal have in common the appellant's contention that the information is jurisdictionally defective and fatally insufficient because it does not charge the appellant *with himself* threatening to commit violence, thus omitting an essential

element of the offense defined by K. S. A. 21-3419. This section of the criminal code reads:

"A terroristic threat is *any threat to commit violence communicated with intent to terrorize another,* or to cause the evacuation of any building, place of assembly or facility of transportation, or in wanton disregard of the risk of causing such terror or evacuation." (Emphasis added.)

Whether the appellant himself must threaten to commit violence is a case of first impression in Kansas. The only cases under 21-3419, *supra,* are *State v. Gunzelman,* 210 Kan. 481, 502 P. 2d 705, 58 A. L. R. 3d 522, which held the statute not to be unconstitutionally vague, and *State v. Torline,* 215 Kan. 539, 527 P. 2d 994, which found substantial competent evidence for conviction.

The idea in K. S. A. 21-3419 was drawn from the American Law Institute's Model Penal Code, § 211.3 which reads:

"A person is guilty of a felony of the third degree if *he* threatens to commit any crime of violence with purpose to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience." (Emphasis added.)

The Model Penal Code's provisions were not completely adopted in Kansas, and its provisions cannot aid in resolving the question before the court. Comment by the Judicial Council indicates the *"new provision"* is designed to fill a gap in the law.

The general rule is that a threat otherwise coming within the purview of a statute need not, unless the statute expressly so requires, be in any particular form or in any particular words, and it may be made by innuendo or suggestion, and need not be made directly to the intended victim. (86 C. J. S., Threats & Unlawful Communications, § 3b, p. 788; and 31 Am. Jur. 2d, Extortion, Blackmail, Etc., § 10, p. 907.) Upon reviewing the authorities hereafter cited we hold, under K. S. A. 21-3419, it is not essential that the defendant threaten to do the acts mentioned in the communication himself. It is sufficient for the defendant to convey the threats of some other person to do the forbidden acts *if the defendant sends the communications with the specific intent to terrorize another which is forbidden by the statute.* (86 C. J. S., Threats & Unlawful Communications, § 4a, p. 795; *People v. Hopkins,* 105 C. A. 2d 708, 233 P. 2d 948 [1951] [defendant said "gangsters from Chicago" would "bump off" victim]; *The State vs. Compton,* 77 Wis. 460, 46 N. W. 535 [1890] [defendant sent letter saying "decent citizens" would tar ladies]; *State v. Cashman,* 217 A. 2d

28 [Me. 1966] [words "they would take care of me" constituted a threat]; and *People v. Dioguardi,* 8 N. Y. 2d 260, 203 N. Y. S. 2d 870, 168 N. E. 2d 683 [1960].) Any other holding would immunize terrorists with sufficient intelligence to avoid making a personal threat.

The appellant calls our attention to PIK Criminal, § 56.23 which sets out the following as the first element to be given in the instruction: "That the defendant threatened to commit violence." PIK Criminal, § 56.23 correctly sets out the law when the defendant himself threatened to commit violence and communicates the terroristic threat. However, where another allegedly makes the threat to commit violence and the defendant communicates the threat with the intent to terrorize, PIK Criminal, § 56.23 must be modified.

The appellant attempts to argue he was only warning others of his wife's purchase of a gun, and not attempting to terrorize others. *State v. Gunzelman,* supra, indicates the main elements of the offense of terroristic threat are *threats communicated with a specific intent to terrorize another.* The trial court adequately instructed the jury on the intent to terrorize, and sufficient evidence was presented to the jury concerning the circumstances under which the alleged threat was uttered and the relations between the appellant and the complaining party from which the jury could reasonably have drawn an inference of guilt. (*State v. Torline,* supra.)

The appellant contends the trial court erred in failing to refer to an administrative judge his January 23, 1975, *pro se* "motion for a change of judge and affidavit of prejudice." The trial court overruled this motion on the ground that it was not an affidavit, but simply a document acknowledged before a notary public. K. S. A. 20-311d, as discussed in *Hulme v. Woleslagel,* 208 Kan. 385, 493 P. 2d 541, controls here. This section of the statute requires a party to file "an affidavit alleging any of the grounds specified" in the statute for change of judge. An *affidavit* is defined as being a written statement, under oath, sworn to or affirmed by the person making it before some person who has authority to administer an oath or affirmation. (2A C. J. S., Affidavits, § 2, p. 435-436; and 3 Am. Jur. 2d, Affidavits, § 1, p. 380.)

Here the purported affidavit *was simply acknowledged before a notary public. Since it is essential to the validity of an affidavit that it be sworn to or affirmed before some person, the requirements for an affidavit are not met.* (2A C. J. S., Affidavits, § 30, pp. 463-466;

and 3 Am. Jur. 2d, Affidavits, § 11, p. 389.) Cases under the federal statute for judicial disqualification, 28 U. S. C. § 144, which requires affidavits, have refused to accept motions which are not supported by an affidavit. (*McLaughlin v. Venore Transportation Co.*, 244 F. Supp. 802 [D. Mass. 1965]; and *Galella v. Onassis*, 487 F. 2d 986 [2nd Cir. 1973].)

Accordingly, we hold where no "affidavit" is filed a motion for change of judge under 20-311d, *supra*, is insufficient and must fail. This is in accord with our past decisions construing 20-311d, *supra*. In *Hulme v.Woleslagel*, supra, at 394 and *Collins v. Kansas Milling Co.*, 210 Kan. 701, 504 P. 2d 586, the court held an affidavit filed by the attorney and not by the party litigant was insufficient on its face. In *State v. Timmons*, 218 Kan. 741, 749, 545 P. 2d 358, the defendant's failure to timely file an affidavit of prejudice barred his assertion that the trial court erred in failing to recuse himself in response to his affidavit.

While the appellant filed his motion *pro se*, he and his trial counsel had sufficient time to pursue efforts for change of judge by complying with the requirements of 20-311d, *supra*, before trial. Not having done so, the appellant cannot now complain.

The judgment of the lower court is affirmed.