NOT DESIGNATED FOR PUBLICATION

No. 127,684

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JACOB ALAN KEIM,
*Appellant*.


MEMORANDUM OPINION

Appeal from Leavenworth District Court; CLINTON LEE, judge. Submitted without oral argument. Opinion filed January 23, 2026. Affirmed.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Andrew J. Lohmann*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.


Before MALONE, P.J., COBLE, J., and SEAN M.A. HATFIELD, District Judge, assigned.


PER CURIAM:  Jacob Alan Keim appeals his conviction for criminal threat in the Leavenworth County District Court. Keim argues that the State's evidence was insufficient to support his conviction and that the prosecutor's errors during closing arguments undermined his ability to obtain a fair trial. On thorough review of the record on appeal, we find the evidence sufficient to sustain his conviction, find no prosecutorial error, and therefore affirm his conviction.

1

Keim, a relatively large man, married the mother of three children, the youngest of whom is L.B. The family lived in a small house with several extended family members, including Keim's stepdaughter, N.B.

L.B. had a history of showing disrespect to his mother and stepfather. On the date of the incident in this case, L.B., who was 10 years old and relatively small for his age, talked back to his mother, and Keim threatened to take L.B.'s hoverboard as punishment. Keim tried to take L.B. off the hoverboard when L.B. reacted, lost his balance, and fell off.

L.B. called the police and accused Keim of pushing him off the hoverboard. The incident occurred outside, and, when the police arrived, L.B. was on the ground, screaming, crying, and "flailing around." The two police officers who responded thought L.B. might calm down if he moved inside, but L.B. resisted. The officers suggested that Keim and L.B.'s mother could carry him inside. They complied with difficulty and set L.B. on the living room couch. The officers followed the family into the house, stayed for a few moments until the situation had begun to de-escalate, and then left the house. L.B. remained in a foul mood, believing his parents were behaving unjustly.

When the police left the house, L.B.'s sister, N.B., went to her bedroom to draw. Since bringing L.B. into the house, his mother continued to sit next to him, trying to calm him. During this conversation, L.B.'s mother asked the child do something. The request prompted a sassy response from L.B., and Keim erupted, yelling at L.B. When Keim engaged with L.B., the situation quickly escalated again, with L.B. yelling back at Keim. L.B. continued to provide disrespectful responses to his mother and Keim, although N.B. would later testify that L.B. was not threatening, and Keim responded with anger. As the shouting began, N.B. became scared and worried that the confrontation might escalate

into violence and began to video-record the encounter with her cellphone. By the time N.B. began her recording, L.B. was extremely upset.

N.B. remained in her room, so the video does not show the interactions between L.B. and Keim; it provides only the sounds of the verbal exchange, while N.B. narrates what she believed was happening outside her bedroom. In the video recording, which was played for the jury, L.B. is screaming and telling people to get back. Keim is shouting at L.B.

At the point the recording begins, Keim shouts, "I am going to get physical, now move!" As the confrontation escalated, Keim purportedly threw his cup of water. L.B. responded, "What did I do?" L.B. also shouted at Keim to get out of his house, to which Keim responded, "You don't own shit in this goddamn house." As L.B. is heard crying, Keim added, "You don't even own a goddamn soul, you little cocksucking motherfucking Jew! Come over here and say something. I will fucking put something down your goddamn throat! My fucking fist, you little punk! I'm done!"

Keim stormed off, and N.B. narrates her understanding of what happened. But, Keim apparently returned, and L.B. said something that the recording did not pick up. This prompted L.B.'s mother to tell L.B. to shut his mouth. Keim says something, and L.B.'s mother responded that she would take care of it, saying, "I'm going to do it." Keim replied, "I don't see you doing shit. Now move before I barrel through now. You got one more chance to fucking say something."

Based on the sound of the voices, N.B. surmised that her mother was standing in the hallway, blocking Keim from reaching L.B. L.B.'s mother then slapped L.B. several times, and L.B. called her a monster. On the recording, N.B. says that her mother slapped her father, but, at trial, she explained that she meant to say "brother" rather than "father."

3

L.B. told his mother to "go die in a hole," which Keim parroted back to L.B., telling him to go die in a hole.

L.B. says something, which prompts his mother to lose her composure, and she shouts at him, "Stop. I have no silent room to put you in. Shut up." Keim then says, "Because you're a fucking little rapist. That's why." L.B. retorts to Keim, and Keim says, "You're lucky your mom is in front of you because I'd rip your fucking dick off and feed it to you, you little pedophile."

The confrontation continues for another three minutes, but N.B. is narrating her feelings about her living situation and her mother's divorce from her father. She mentioned that her mother was calling the police. The video ends shortly thereafter. The same officers responded, indicating that the second call came in less than 10 minutes after they had departed the house after the first call.

N.B. did not emerge from her room to report what she heard to the police. She felt unsafe around Keim and was frightened of what Keim and her mother might do. The police ultimately took L.B. for a mental health evaluation at a local hospital. Keim and L.B.'s mother gradually calmed down after L.B. left the house.

After the police returned L.B. to the home, N.B. left her room to check on him. L.B. was sitting calmly on the couch. N.B. superficially checked her brother for injuries but did not detect any visible marks. She observed water splatters on the television and the couch where L.B. had been sitting, and a cup lying on the floor of the living room.

Someone filed a report with the Kansas Department for Children and Families alleging emotional abuse of the children and referring to this specific incident. A social worker was assigned to interview L.B. and N.B. separately at their schools. N.B. asked the social worker if she was there to help her. The social worker asked why she thought

4

she needed help, and N.B. told the social worker about the video she had taken. When N.B. offered to show the social worker the video and the social worker expressed interest, N.B. shared the video she had taken with the social worker.

A few months after the incident, N.B. and L.B. changed residences to live with their biological father. L.B. stayed only a short time before being placed in an inpatient mental health facility.

The State originally charged Keim with criminal threat and misdemeanor battery. The battery charge was later amended to domestic battery. Keim waived a preliminary examination hearing. The case proceeded to jury trial. After the State presented its case-in-chief, Keim moved for a judgment of acquittal on the battery charge for insufficient evidence. The court agreed that the State had presented insufficient evidence that Keim touched L.B. and dismissed the charge. Keim declined to present any evidence. The jury returned a verdict convicting Keim of criminal threat.

Keim filed a motion for new trial, challenging the district court's ruling on some evidence beneficial to the defense and arguing that the State misrepresented the applicable standard for intent during its closing arguments.

At sentencing, the district court denied the motion for new trial. The court ordered Keim to serve an underlying prison term of 6 months but suspended the term in favor of 12 months of probation. The court ordered the standard 12-month postrelease supervision term and imposed $543 in costs and fees.

Keim timely appealed.

THE STATE PRESENTED SUFFICIENT EVIDENCE OF CRIMINAL THREAT

Keim first challenges the sufficiency of the evidence supporting his conviction for criminal threat. Our standard of appellate review is well-established. When a criminal defendant challenges the sufficiency of the evidence supporting his or her conviction, an appellate court reviews the evidence presented at trial in a light most favorable to the prosecution to determine whether a rational factfinder could have concluded that the defendant was guilty beyond a reasonable doubt. When conducting this review, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or determine the credibility of witnesses. In summary, an appellate court will only reverse a guilty verdict for insufficient evidence when the testimony is so incredible that no reasonable factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Ninh*, 320 Kan. 477, 486, 570 P.3d 1169 (2025).

As instructed by the court and required by K.S.A. 21-5415(a)(1), the jury was required to find the following elements of criminal threat beyond a reasonable doubt:

> "1. The defendant threatened to commit violence and communicated the threat with the intent to place [L.B.] in fear.
> "2. This act occurred on or about the 16th day of May, 2023, in Leavenworth County, Kansas.
> "The State must prove that the defendant intended to place [L.B.] in fear. A defendant acts with intent when it is the defendant's conscious objective or desire to cause the result complained about by the State."

Citing United States Supreme Court precedent, Keim argues that no reasonable juror could believe he actually intended the violence he threatened against L.B. and that he was merely exercising hyperbole out of frustration and anger.

Contrary to Keim's appellate argument, however, the exercise of hyperbole is not necessarily incompatible with criminal threat. The offense of criminal threat is committed when a person communicates any threat to commit violence with the intent to place another person in fear, even if the speaker does not intend to carry out the specific threat. See *Virginia v. Black,* 538 U.S. 343, 359-60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

> "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *The speaker need not actually intend to carry out the threat*. Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.' Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death. [Citations omitted.]" (Emphasis added.) *Black*, 538 U.S. at 359-60.

The communication must be more than idle bluster or a joke; it must be a true threat of violence. *State v. Cope*, 273 Kan. 642, 646, 44 P.3d 1224 (2002) (citing *State v. Phelps*, 266 Kan. 185, 196, 967 P.2d 304 [1998]). But the specific words communicated are less important than the threat conveyed. See K.S.A. 21-5111(ff) (defining "[t]hreat" as "a communicated intent to inflict physical or other harm on any person or on property"); *State v. Knight*, 219 Kan. 863, 866, 549 P.2d 1397 (1976) ("The general rule is that a threat otherwise coming within the purview of a statute need not, unless the statute expressly so requires, be in any particular form or in any particular words, and it may be made by innuendo or suggestion, and need not be made directly to the intended victim."); *State v. Rivera*, 42 Kan. App. 2d 914, 919-20, 218 P.3d 457 (2009).

Distinguishing between joking comments and true threats depends on the circumstances and the relationship of the parties. *Rivera*, 42 Kan. App. 2d at 920. So long

as the comment communicates the speaker's intent to commit an unlawful act of violence, the specific words spoken or even words left unspoken are immaterial. For example, a person intending to cause physical harm to another in anger might declare, "I am going to rip your head off," or "I'm going to bury you." The recipient of that threat may understand that the speaker does not truly intend to rip his or her head off or to start digging a hole to put him or her in but may nonetheless understand the threat of violence behind the hyperbolic statement to be serious. People acting aggressively frequently speak in hyperbolic terms. Sometimes the hyperbole constitutes mere bluster, but, at other times, the hyperbole is intended to convey a real threat of violence, even if not necessarily the specific violence threatened.

Actual intent is frequently established by circumstantial evidence. *State v. Gonzalez*, 311 Kan. 281, 288, 460 P.3d 348 (2020) ("Intent is usually proven by inference arising from circumstantial evidence."). Intent may be inferred from physical acts as well as verbal statements. *State v. Miller*, 6 Kan. App. 2d 432, 435, 629 P.2d 748 (1981). "All circumstances surrounding the communication, including the relationship between the parties, must be considered in determining whether the communication in issue is a [criminal] threat." 6 Kan. App. 2d at 435.

The circumstances of this case support the jury's conclusion that Keim's communications to L.B. constituted true threats as opposed to bluster or a joke. The history of the relationship was filled with contention. Keim did not make a single threat during this incident but issued multiple threats of violence. Keim indicated that the only reason he was not inflicting violence on L.B. was that L.B.'s mother stood in his way. L.B.'s mother slapped her son several times, after Keim indicated that she was not handling the situation properly. This provides circumstantial evidence that L.B.'s mother anticipated that Keim believed physical violence an appropriate response to L.B.'s behavior. Though N.B. testified that Keim had never before put his hands on L.B., Keim's comments about "being done" with L.B.'s behavior communicated Keim's intent

8

to take a different approach to L.B. than he had taken in the past. In any event, Keim's comments to L.B. were clearly designed to invoke a change in L.B.'s behavior. The character and method of delivery of the comments suggest that Keim intended to intimidate and cow L.B. into complying with his wishes. Taken in a light most favorable to the prosecution, the evidence was sufficient to lead a rational juror to conclude beyond a reasonable doubt that Keim intended to communicate a true threat of violence to L.B.

Keim also contends that the evidence was insufficient to demonstrate that L.B. was actually afraid. However, placing the intended victim in fear or apprehension of bodily harm is not an element of criminal threat, as it is an element of assault. Compare K.S.A. 21-5412(a) ("Assault is knowingly placing another person in reasonable apprehension of immediate bodily harm.") with K.S.A. 21-5415(a)(1) ("A criminal threat is any threat to: [1] [c]ommit violence communicated with intent to place another in fear."). So long as Keim intended to place L.B. in fear, the effectiveness of his conduct to implement that intent is irrelevant to the charge. See *State v. Hunt*, No. 112,823, 2015 WL 4366555, at *3 (Kan. App. 2015) (unpublished opinion) ("The criminal threat statute does not require that a defendant communicate the threat to the person he or she intended to place in fear or recklessly placed in fear."). Keim's argument that the State failed to establish that L.B. was afraid of violence by Keim does not provide a basis for reversing his conviction for criminal threat.

NO PROSECUTORIAL ERROR UNDERMINED KEIM'S ABILITY TO OBTAIN A FAIR TRIAL

Keim next argues that prosecutorial error during closing arguments undermined his ability to obtain a fair trial. Keim conceded that he did not object to the prosecutorial errors he challenges in this appeal but correctly contends that appellate review is still appropriate. Challenges to prosecutorial error during closing argument need not be preserved by a contemporaneous objection at trial. See *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021) ("[W]e will review a claim of prosecutorial error based on

comments made during voir dire, opening statement, or closing statement even in the absence of a contemporaneous objection.").

In considering a claim of prosecutorial error, an appellate court first determines whether an error occurred. Prosecutorial error occurs when the prosecutor's actions or statements "fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016); see also *Bodine*, 313 Kan. at 406 ("[A] prosecutor commit[s] error if the act complained of [falls] outside the wide latitude afforded the prosecutor in conducting the State's case in a way that does not offend the defendant's constitutional right to a fair trial.").

The wide latitude afforded prosecutors to present the State's case encompasses argument and reasonable inferences drawn from the evidence presented at trial so long as the argument or inferences accurately reflect the evidence and correctly state the governing law. As such, argument may not be designed to inflame the passions of the jury or to otherwise divert the jury from its duty to decide the case on the controlling law as applied to the evidence admitted at trial. In considering whether comments exceeded the scope of permissible argument, the court considers the context in which the comments were made, not in isolation. 313 Kan. at 406-07.

If the court discovers error, then it considers whether the error prejudiced the defendant's due process right to a fair trial. 313 Kan. at 406. Prosecutorial error is harmless only if the reviewing court is satisfied beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. Stated differently, the error is harmless if there is no reasonable possibility that the error contributed to the verdict. *Bodine*, 313 Kan. at 406 (citing *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 [2020]; *State v. Chandler*, 307 Kan. 657, 674, 414 P.3d 713 [2018]).

10

Keim challenges two aspects of the State's closing arguments. First, he contends that the State argued facts not in evidence by alluding to N.B.'s opinion that Keim intended to "put his hands on" L.B. Second, he argues that the State improperly referred to Keim's throwing of a cup at L.B. to argue that those physical acts were circumstantial evidence of his intent to commit violence, because the district court dismissed the battery charge based on the cup-throwing incident for insufficient evidence.

*Arguing Facts Not in Evidence*

First, Keim claims the State argued facts not in evidence by alluding to N.B.'s opinion that Keim intended to "put his hands on" L.B. During presentation of evidence, this exchange occurred:

> "[PROSECUTOR:]  So when he says to your mom, 'I don't see you doing shit, now move before I barrel through now,' did you take that to mean that he was going to put his hands on [L.B.]?
> "[N.B.:]  Yes, ma'am.
> "[DEFENSE ATTORNEY:]  Objection; speculation.
> "THE COURT: Sustained."

Given the district court's granting of Keim's objection, he now argues the prosecutor inappropriately referenced N.B.'s inadmissible speculation in closing.

A prosecutor errs by arguing a fact or factual inference with no evidentiary foundation. *State v. Moore*, 311 Kan. 1019, 1040, 469 P.3d 648 (2020). But the context of the challenged statement does not necessarily support a conclusion that the State argued a fact that was not in evidence. When discussing the evidence demonstrating Keim's intent to place L.B. in fear, the prosecutor argued:

> "Now, the—the evidence that was presented you to show that he intended to place in fear, I'd like you to examine the tone of his voice, the volume of his voice, the

11

physical actions that you hear accompanying threats being made within the video, and [N.B.]'s testimony.

"Additionally, [N.B.] testified the only reason she believed her mother struck [L.B.] was to stop the defendant from doing so. That he intended to actually act on these actions, that he had threatened to commit violence and showed po—perhaps an intent to actually do it that was intervened by Mother."

Although Keim challenges the reference to N.B.'s testimony as referring to the stricken testimony, we find this argument to be a stretch. The closing argument did not specifically reference the objectionable part of N.B.'s testimony. Much of N.B.'s commentary on the video, which was played for the jury without objection, expressed her opinions regarding what was occurring outside her bedroom. Because these opinions were admitted without objection, they constituted evidence at trial. And, the prosecutor also referenced the tone and volume of Keim's voice and other sounds clearly present on the video, which again, was admitted into evidence and played for the jury. Without additional context, the jury would not have assumed that the State referred to the evidence excluded through defense counsel's objection.

Even if Keim is correct that this comment alluded to N.B.'s excluded opinion regarding Keim's intent, the passing comment is vague, and as a result, is not particularly compelling. Additionally, the district court admonished the jury both that it was not to infer meaning into the court's evidentiary rulings, and that it was to disregard any statements, arguments, or remarks of counsel that were not supported by the evidence. Absent some evidence to the contrary, this court presumes the jury followed the instructions provided by the court. *Ninh*, 320 Kan. at 494 ("Courts must presume that jury members follow the instructions given.").

Accordingly, if the jury happened to conclude that the State's rather ambiguous reference to N.B.'s testimony improperly referred to N.B.'s objectionable opinion about

Keim's intent, the jury presumably disregarded the comment in reaching its verdict as instructed by the court. We find no prosecutorial error here.

*Improper Reference to Cup-Throwing Incident*

Within the same context as the previous sub-issue, the prosecutor referred to "physical actions that you hear accompanying threats being made within the video." Keim challenges this comment because the district court had dismissed the battery charge against Keim after the State rested its case.

Keim's argument on this point not only misconstrues the basis for the court's judgment of acquittal on the battery charge but also fails to establish a connection between the judgment of acquittal and the admissibility of the evidence. The district court granted summary judgment in favor of Keim on the battery charge, not because the video recording provided unclear evidence that Keim had acted violently in throwing the cup of water, but because the evidence was insufficient to establish that L.B. was hit by the cup or the water.

Because the evidence was sufficient to establish that Keim acted aggressively or violently in throwing the cup of water, the State's reliance on this incident as evidence of Keim's intent to put L.B. in fear was appropriate. Likewise, contrary to Keim's appellate argument, the throwing of the cup was not the only evidence of Keim's physical actions recorded on the video. At one point, Keim shouted that he was done. The comment was followed closely by a sound like a slammed door or someone hitting a wall. The temporal proximity of the noise to Keim's comments created a reasonable inference that Keim acted violently in some manner.

Accordingly, Keim fails to establish prosecutorial error in this aspect of the State's closing argument. The argument fell within the wide latitude prosecutors are afforded to present their case.

Affirmed.